PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.                                          No. 04-4553

GWENDOLYN CHEEK HEDGEPETH,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(CR-03-297)

Argued: March 18, 2005

Decided: August 12, 2005

Before NIEMEYER, LUTTIG, and KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Luttig joined.

## COUNSEL

**ARGUED:** William Todd Watson, HARGETT & WATSON, P.L.C., Richmond, Virginia, for Appellant. Stephen Wiley Miller, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** David B. Hargett, HARGETT & WATSON, P.L.C., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Michael J. Elston, Assistant United States Attorney, Alexandria, Virginia, for Appellee.

**OPINION**

KING, Circuit Judge:

Gwendolyn Cheek Hedgepeth, a former member of the Richmond City Council, appeals her convictions and sentence in the Eastern District of Virginia on multiple offenses arising from a bribery and extortion scheme. The activities underlying that scheme occurred in 2002 and 2003, and related to the City Council's selection of a Mayor and interim Council members. An FBI undercover investigation gave rise to the grand jury's indictment of Hedgepeth and to her resulting convictions. Hedgepeth was first indicted on August 20, 2003, and the grand jury returned a second superseding indictment on January 6, 2004. The second superseding indictment, on which she was tried, charged Hedgepeth in five counts with violations of the Hobbs Act and related offenses.[1] More specifically, she was charged with conspiracy to commit extortion, in contravention of 18 U.S.C. § 1951 (Count One); attempting to commit extortion, in violation of 18 U.S.C. §§ 1951-1952 (Count Two); making false statements to federal officers, in contravention of 18 U.S.C. § 1001 (Count Three); extortion and attempting to commit extortion, in violation of 18 U.S.C. § 1951 (Count Four); and conspiracy to commit mail fraud, in contravention of 18 U.S.C. §§ 371 and 1349 (Count Five).

Hedgepeth's jury trial began in Richmond on March 30, 2004, and concluded on April 2, 2004. She was convicted of Counts One through Four and acquitted on Count Five. Hedgepeth was sentenced

---

[1]Section 1951 of Title 18 of the United States Code, commonly referred to as the Hobbs Act, was enacted in 1948. It provides, in pertinent part, that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires to do so . . . shall be fined . . . or imprisoned . . . or both." 18 U.S.C. § 1951(a). The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." § 1951(b)(2); *see also McCormick v. United States*, 500 U.S. 257, 272-73 (1991) (discussing elements of Hobbs Act extortion, particularly in context of property obtained "under color of official right").

on July 2, 2004, to forty-four months of imprisonment, and she has filed a timely appeal. Hedgepeth raises three issues on appeal, two concerning the trial court's evidentiary rulings and the third arising from the court's refusal to delay her sentencing hearing. As explained below, we find no reversible error and affirm.

I.

A.

Hedgepeth represented Richmond's Ninth District on the City Council from 1992 through 1994, and again from 1998 through the events underlying this prosecution. In 2002, Hedgepeth became the subject of an FBI investigation when she accepted money in connection with her involvement in certain City Council business. The investigation's initial target had been H. Louis Salomonsky, a wealthy architect and real estate developer in Richmond, and a friend of several Council members, who had sought to secure the election of Councilman William Pantele as Mayor.[2] Salomonsky was interested in the Council's activities because it was the ultimate zoning authority for Richmond.

Robert Davis, Salomonsky's acquaintance of twenty-five years, cooperated with the FBI's investigation of Salomonksy, and later, of Hedgepeth. Davis, a convicted felon, had been charged in October 2002 with illegal possession of a firearm, and he agreed to assist the investigation in an effort to mitigate his own problems. Davis met with Salomonsky on December 10, 2002, and, at the direction of the FBI, wore a wire transmitter. During the meeting, Salomonsky expressed his interest in having Pantele elected as Mayor, and Davis asked Salomonsky if he needed assistance securing Hedgepeth's vote. Salomonsky responded that he thought that "Gwen Hedgepeth might be in the kickback business,"[3] and expressed an interest in Davis's

_____

[2]At the time of these events, the Mayor was elected by the nine-member City Council.

[3]At trial, both the prosecution and the defense presented and utilized, before the jury, several excerpts from video and audio recordings. Despite a discussion between the court and counsel about the manner in

assistance. When Salomonsky asked Davis, "What do you think it's going to cost?" Davis replied, "probably a thousand dollars."[4]

At the direction of the FBI, Davis then contacted Hedgepeth, who he had known from various dealings with City Council and from other activities in the community. Davis met Hedgepeth on December 19, 2002, at the Henderson Middle School, where she taught. Davis was again wired by the FBI. At this meeting, Hedgepeth agreed to support Pantele for Mayor. After pledging her support, she mentioned her campaign debt of $2158: "You asked me about helping . . . with this Mr. Pantele thing . . . so I can help with that . . . now when can you help me with my debt?" According to Davis, it was his "understanding" that if Hedgepeth's campaign debt was paid off, she "would back Mr. Pantele." Davis subsequently reported to Salomonsky that it was going to cost $2158 to get Hedgepeth to vote for Pantele.

Davis talked to Hedgepeth again on December 23 and 31, 2002. By then, Pantele's chances of being elected Mayor had become slim. When Davis asked Hedgepeth whether she could support Pantele for Vice-Mayor, she advised that she was backing another Council member for that post. During their December 31 meeting, Hedgepeth, in referring to the money Davis had promised, asked if Davis's friends were "supportive . . . depending on how I vote, or are they supportive from a standpoint of I have, you know, tried to make this thing work." The next day, Davis spoke with Hedgepeth again, and they mutually agreed that Pantele "didn't have a chance." The Council meeting to select the Mayor and Vice-Mayor was held on January 2, 2003, and Mr. Pantele was not elected to any office.

---

which the tapes would be transcribed into the record, the contents of those evidentiary recordings are not in the trial transcript, which simply notes, on multiple occasions, "tape being played." As a result, the quotations used herein are from the witnesses' testimony or from portions of the recording transcripts read into the record during questioning by the lawyers. In these circumstances, we give the benefit of the doubt to Hedgepeth where the quotations conflict, though such conflicts are typically trivial and ultimately inconsequential.

[4]Davis also testified that the $1000 figure he gave Salomonsky was pulled "out of the air." He speculated on that sum because he "knew [Hedgepeth] needed money."

Davis met with Hedgepeth again on January 22, 2003, wired by the FBI. Davis gave Hedgepeth $500 in cash, according to Davis, to "sort of thank her for the attempt to help Pantele be mayor or vice mayor," and as a "retainer or whatever . . . to help us in the future because she still needed the money." Hedgepeth accepted the cash and advised Davis that she would enter it as a contribution "by more than one," so that she would not have to itemize who had contributed the money.

Over four months later, on May 8, 2003, two FBI agents interviewed Hedgepeth at her residence. When they asked whether Pantele or anyone had offered to pay for her vote in the mayoral election, she answered no. She denied that anyone had sought to gain influence with her by making "disguised" payments, by paying down her campaign debt, or by making her a loan with favorable terms. Because the agents considered certain of Hedgepeth's responses to be false, they continued to investigate her.

In the summer of 2003, two unexpected vacancies arose on the City Council.[5] These vacancies were to be filled by interim members appointed by the Council on July 28, 2003, and then by members to be elected by the voters in November 2003. Davis, again wired by the FBI, contacted Hedgepeth on July 15 and 16 to discuss the vacancies and two possible candidates, Ellen Robinson and Lawrence Williams, for the Sixth District seat. Hedgepeth expressed an inclination to support Robinson, but Davis asked Hedgepeth to "change horses" and "back" Williams. Davis stated, "If you could do that, heck, I will meet you tomorrow and give you the money to clean up your campaign debt." Hedgepeth replied, "Well, let me, let me keep these things separate, man, because I can't, I can't be in a position where I am, let me say, compromising."

Davis and Hedgepeth met again on July 21, 2003, seven days before the Council meeting at which the interim members were to be appointed. On this occasion, they went to a McDonald's restaurant and then returned to Davis's vehicle, which was equipped with FBI audio and video equipment. Hedgepeth stated that she had "settled it in her heart" to support Williams. She and Davis also discussed Wil-

---

[5]The two vacancies arose because Councilman Joe Brooks died in June 2003, and Councilman Sa'ad El-Amin resigned on July 1, 2003.

liams's need to obtain posters and a voter list, and to request funds from potential supporters for the upcoming election.[6] Davis then handed Hedgepeth $2000 in $100 bills, saying to her, "Well, honey, listen here is two grand, count it, make sure it's right." He told her that it was for her help backing Williams. When Hedgepeth hesitated, Davis assured her, "I have counted it one time." Hedgepeth again hesitated, stuttering, "This. This." Davis testified that she held the money "for a period of time," and he did not "understand why this hesitancy." Davis urged her, "You can do whatever you want to with it." Hedgepeth responded, "This is what I need you to do," and asked Davis, "Can you get four people to give me $500 in contributions?" Davis responded that he did not want to ask other people to do anything, and told her to "spend [it] how you want to. It's cash. Buy things that you need." Hedgepeth replied, "So I'm hearing you say this is not a campaign contribution." Davis then offered suggestions as to how she could use the money: "You can help little kids with it if you want to," and, "You can give it to the church if you want to, I don't care." Hedgepeth then stated that she would use the money "for the kids' computer [project]," one of Hedgepeth's priority Council initiatives.[7]

On July 24, 2003, FBI agents arrested Hedgepeth, and interviewed her at the Richmond FBI office. They also recovered the $2000 in cash, though one of the $100 bills had been replaced with five $20 bills.

B.

At trial, Salomonsky and Davis testified for the prosecution regarding their dealings with each other and with Hedgepeth. As part of the

---

[6]In her trial testimony, Hedgepeth contended that the audio tapes showed that her support for Williams referred to his candidacy in the November election, rather than for an interim appointment by the Council; thus, she maintained, she was not accepting money from Davis in exchange for her vote on Council.

[7]On July 21, 2003, not long after receiving the $2000 in cash from Davis, Hedgepeth engaged a computer technician for the school computer project, for the sum of $2000. She instructed him to apply to the City Council for employment and for payment.

prosecution's case-in-chief, Salomonsky testified, over objection, that during his December 10, 2002 meeting with Davis, he had asserted that he thought "Gwen Hedgepeth might be in the kickback business." The court admitted this statement (the "Kickback Statement") into evidence, and gave the jury a cautionary instruction that Salomonsky had testified why he chose to approach Hedgepeth, that the evidence was not being offered for its truth, and that the jury was not to consider it in determining whether Hedgepeth had committed a criminal offense.[8]

Hedgepeth testified in her own defense, denying any criminal intent in connection with the events, and asserting that she had not accepted money in exchange for her actions as a member of the City Council. Instead, she insisted, relying on FBI transcripts of her meetings with Davis, that she had been offering her "support" rather than her "vote," and that the two were distinct concepts. She testified that she favored Williams for appointment to Council of her own accord, because he was an architect and had met with her about a community center she supported. She maintained that her July conversations with Davis regarding support of Williams contemplated the November 2003 election, rather than an interim Council appointment.

---

[8]The court's cautionary instruction concerning Salomonsky's testimony about the Kickback Statement was as follows:

> Ladies and gentlemen, I want to give you one cautionary instruction that will govern your use of portions of Mr. Salomonsky's testimony.

> Mr. Salomonsky has just testified as to why he chose Ms. Hedgepeth as opposed to any other council member to be approached.

> This information and testimony is offered for the sole purpose of your understanding Mr. Salomonsky's reasoning. It is not offered for the truth, and it is not to be considered by you for any reason in determining whether Ms. Hedgepeth committed the offenses for which she is charged; in other words, it merely demonstrates Mr. Salomonsky's mental process and why he took a given course of action. It's not being offered for the truth of the matter, but only what his logic and reason was.

On cross-examination, the prosecution impeached Hedgepeth's testimony with certain oral statements she had allegedly made to the FBI agents following her arrest. These statements, recorded and summarized by the agents in their "302" reports, included admissions that she "should not have discussed both [her] campaign debt and voting for Pantele for mayor during the same conversation," and that she realized that "what [she] had done was wrong." The prosecution also suggested, based on the 302 summaries, that Hedgepeth had admitted to the agents that her dealings with regard to Williams involved the interim appointments.

In response, Hedgepeth's lawyer sought to present, as substantive evidence, a separate written statement she had given to the FBI agents during the interview where the oral statements were made. The written statement, signed by Hedgepeth and witnessed by an FBI agent, did not reference either the interim election or certain facts recited in the 302 reports. By this evidence, Hedgepeth sought to rebut the prosecution's characterization of her oral statements to the agents, and to show that her trial testimony was actually consistent with her statements in the post-arrest interview. The trial court declined to admit her written statement, deeming it to be inadmissible exculpatory hearsay; however, it permitted Hedgepeth's lawyer, in examining her, to refer to the written statement and elicit certain of its contents, including the fact that it did not mention the interim Council appointments.

C.

After the four-day trial, the jury returned a guilty verdict on four of the charges against Hedgepeth, acquitting her only on Count Five, the mail fraud conspiracy charge. On July 1, 2004, the day before her sentencing hearing, Hedgepeth's lawyer, Mr. Baugh, sought to withdraw from his representation, on the ground that the attorney-client relationship had broken down. On the day of sentencing, Hedgepeth requested that the hearing be continued, based on newly-developed evidence of diminished capacity, in the form of a psychiatrist's report delivered to her lawyer late on the previous day. Her lawyer contended that the report suggested that Hedgepeth might have a viable basis for a diminished capacity downward departure, but that the issue required further investigation.

The court ruled that the report did not support any further investigation of a diminished capacity downward departure because it did not "begin to satisfy the elements. . . . I looked at the videotapes. . . . This was a lady who thought about [accepting the money], contemplated, discussed it, before she accepted it." The court then denied Hedgepeth's motion to continue the sentencing hearing. On counsel's motion to withdraw, the court advised Hedgepeth, "[w]e are going forward today," and "you can represent yourself, or Mr. Baugh can represent you." Hedgepeth stated that she did not wish to represent herself, and then agreed that Mr. Baugh could continue to represent her "in protest."

During the sentencing hearing, the court permitted the psychiatrist who had authored the report, Dr. Shepard, to testify regarding Hedgepeth's use of Paxil and its potential adverse neurological impact. The court also heard testimony from another psychiatrist, Dr. Israel, concerning Hedgepeth's mental state, particularly the multiple personal and family problems she had experienced in the previous ten years. The court also admitted the evidence of two character witnesses and heard a distressed allocution from Hedgepeth herself. Finally, the court sentenced Hedgepeth to forty-four months of imprisonment, relying on the calculations and conclusions of the presentence report.[9]

Hedgepeth has filed a timely notice of appeal, and she raises three contentions of error. First, she challenges the admission of the Kickback Statement; second, she maintains that the court erred in failing to admit her post-arrest written statement; and, third, she contends that the court's refusal to continue her sentencing hearing was prejudicially erroneous. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[9]In sentencing Hedgepeth, and in keeping with our suggestion in *United States v. Hammoud*, 381 F.3d 316, 353 (4th Cir. 2004), the court announced an alternative sentence, in the event that the Sentencing Guidelines were later deemed unconstitutional. The court observed that a non-Guideline sentence of forty-four months would be appropriate. Since then, the Supreme Court has determined that the Guidelines, as previously utilized, were unconstitutional. *See United States v. Booker*, 125 S.Ct. 738 (2005). Hedgepeth has not challenged her sentence on *Booker* ground.

II.

A trial court possesses broad discretion in ruling on the admissibility of evidence, and we will not overturn an evidentiary ruling absent an abuse of discretion. *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996). An abuse of discretion occurs only when a trial court has acted "arbitrarily" or "irrationally" in admitting evidence, *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990) (internal quotation marks omitted), when a court has failed to consider "judicially recognized factors constraining its exercise" of discretion, or when it has relied on "erroneous factual or legal premises," *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993). If an evidentiary ruling is found to be erroneous, we then review the error for harmlessness. *United States v. Francisco*, 35 F.3d 116, 118 (4th Cir. 1994). Where, as here, the error was preserved, the burden for proving harmlessness is on the Government. *See, e.g.*, *United States v. Curbelo*, 343 F.3d 273, 286 (4th Cir. 2003). Finally, a trial court's denial of a continuance is also reviewed for abuse of discretion; even if such an abuse is found, the defendant must show that the error specifically prejudiced her case in order to prevail. *See United States v. Stewart*, 256 F.3d 231, 244 (4th Cir. 2001) (reviewing claim that trial court's denial of continuance resulted in ineffective assistance of counsel).

III.

A.

Hedgepeth's first contention on appeal is that the trial court erred in admitting the Kickback Statement — Salomonsky's testimony that, at his initial meeting with Davis, he advised Davis that he thought that Hedgepeth was involved in the "kickback business." The trial court deemed the Kickback Statement admissible for the limited purpose of showing "to the jury why Mr. Salomonsky adopted the course of action that he did here" — in other words, why he chose to approach Hedgepeth and offer her a bribe. As explained below, even if this ruling was erroneous, it was, in these circumstances, harmless.

The Government maintains on appeal that the Kickback Statement was properly admitted for two reasons. First, it contends that the statement shows why Salomonsky decided to approach Hedgepeth

with the bribe offer, specifically demonstrating that the Government had not targeted her. Second, it maintains that the Kickback Statement was admissible to support the conspiracy charge, showing that Salomonsky had a conspiratorial mindset and that a conspiracy existed (rather than merely constituting an isolated substantive offense committed by Hedgepeth). Finally, if an evidentiary error was made, the Government asserts that it was harmless.

It is elementary that, for evidence to be admissible, it must be relevant to an issue being tried. *See* Fed. R. Evid. 402. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevancy must thus be determined in relation to the charges and claims being tried, rather than in the context of defenses which might have been raised but were not. *See United States v. Prince-Oyibo*, 320 F.3d 494, 501-02 (4th Cir. 2003) (concluding that defendant's evidence of religious persecution was properly excluded where it was irrelevant to only theory charged, and where alternative defenses or theories of culpability to which evidence might have been relevant were not raised).

Put simply, whether the prosecution targeted Hedgepeth in its investigation is hardly probative of any "fact that is of consequence to the determination of the action." Fed. R. Evid. 401. The FBI's motive in investigating Hedgepeth has not been shown to be probative of any element of the offenses for which she was being tried. While the motive of the FBI might have been relevant if Hedgepeth had interposed an entrapment defense, she specifically disclaimed such a defense when the admissibility of the Kickback Statement was questioned. As a result, the Kickback Statement was not admissible to counter an entrapment contention. *See Prince-Oyibo*, 320 F.3d at 501-02. And we are unable to perceive how the FBI's motivation was otherwise relevant to any issue being tried.

As a fall-back position, the Government contends that the Kickback Statement was relevant to prove the conspiracy offense, because it demonstrated Salomonsky's membership therein. As a general proposition, the elements of a conspiracy offense are: "an agreement among the defendants to do something which the law prohibits;

knowing and willing participation by the defendants in the agreement; and an overt act by the defendants in furtherance of the purpose of the agreement." *United States v. Meredith*, 824 F.2d 1418, 1428 (4th Cir. 1987). According to the prosecution, Salomonsky's reason for approaching Hedgepeth is probative of his own intent to engage in a *quid pro quo* exchange, and is thus relevant to the first element of a conspiracy offense — the existence of an unlawful agreement. Hedgepeth contends, in response, that this point is a baseless afterthought, and that, in any event, the evidence was unduly prejudicial and yet inadmissible under the test enunciated by Federal Rule of Evidence 403(b). Pursuant to Rule 403(b), "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by . . . needless presentation of cumulative evidence."

Salomonsky was a cooperating witness for the prosecution at trial, and he testified that he intended to pay Hedgepeth for her vote on Council business. He testified that, after his initial meeting with Davis, he intended for Davis "to meet with Gwen Hedgepeth to find out . . . whether or not she would be interested in a contribution of some sort in consideration for voting for [Pantele]"; that after hearing from Davis that Hedgepeth had asked for money for her campaign debt, he asked Davis, "Does that mean that she will [vote for Pantele] for $2100?"; and that he joked, "So the mayor of Richmond can be gotten for $2000." Significantly, Salomonsky had already pleaded guilty to a conspiracy offense, "attempting to bribe, [and] conspiracy to bribe Gwen Hedgepeth to vote for Mr. Pantele being mayor." Thus, Salomonsky's participation in an unlawful agreement was established without specific evidence that he thought that Hedgepeth "might be in the kickback business." Any probative value of the Kickback Statement was therefore marginal, at best.

On the other hand, the potential prejudicial impact of the Kickback Statement was substantial. The issue at trial was, in substance, whether Hedgepeth was "in the kickback business," or, more specifically, whether she had intended to engage in *quid pro quo* transactions during the incidents charged in the indictment. As a result, the probative value (if any) of Salomonsky's motivation in approaching Hedgepeth is minimal when compared to the Kickback Statement's potential prejudice to Hedgepeth, and it probably should have been

excluded. *See United States v. Grossman*, 400 F.3d 212, 218-19 (4th Cir. 2005) (concluding that trial court correctly excluded evidence where its probative value as to defendant's associate was minimal compared to its prejudicial effect on defendant).

Assuming the Kickback Statement to have been improperly admitted, however, we must assess whether such an error was nonetheless harmless — *i.e.*, whether it "is probable that the error could have affected the verdict reached by the particular jury in the particular circumstances of the trial." *See United States v. Simpson*, 910 F.2d 154, 158 (4th Cir. 1990) (quoting *United States v. Morison*, 844 F.2d 1057, 1078 (4th Cir. 1988)). And, in the circumstances here, it is improbable "that the error affected" the jury's verdict. *Simpson*, 910 F.2d at 158. First, the trial court promptly gave its cautionary instruction to the jury that the Kickback Statement was not to be considered as evidence of Hedgepeth's guilt or innocence. We have consistently observed that such "cautionary or limiting instructions generally obviate prejudice." *United States v. Powers*, 59 F.3d 1460, 1467-68 (4th Cir. 1995) (quoting *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980)). Second, even on the factual issue that the defense pressed — whether Hedgepeth understood or intended to participate in *quid pro quo* transactions — there was ample evidence, viewed in the light most favorable to the Government, for the jury to find the necessary *mens rea*.[10] For example, in the key conversations between Davis and Hedgepeth about Pantele's and Williams's candidacies, Hedgepeth indicated her intention to exchange her vote for Davis's monetary support. In particular, on December 19, 2002, after Davis asked for Hedgepeth's support for Pantele, she immediately requested money, asking, "so I can help with [Pantele's election], all right, now when can you help me with my debt."[11] Similarly, Davis was explicit about

---

[10]The defense pressed the *quid pro quo* point because the Supreme Court has held that one commits the Hobbs Act crime of extortion under color of official right — as opposed to by use of force, violence, or fear — only if "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act" where "the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *See McCormick v. United States*, 500 U.S. 257, 272-73 (1991).

[11]Importantly, under the evidence, Davis had only once previously given Hedgepeth a campaign contribution.

the motive for the payment of $2100 in cash; during their July 8, 2003 telephone conversation, he advised Hedgepeth that he wanted her to "change horses and vote for Larry Williams," and that he would "pay her campaign debt if she would do that." At their July 21, 2003, meeting, when Davis gave Hedgepeth the cash, he told her, "[t]his is for your help backing Larry," and emphasized that it was "not a campaign contribution" and to "spend [it] how you want to." Hedgepeth responded, "So I'm hearing you say that this is not a campaign contribution," and seemed hesitant and uncomfortable. These interactions with Davis were captured on video and audiotape, and they were attested to by multiple witnesses. As a result, it is not probable that an erroneous admission of the Kickback Statement affected the verdict, and any error in its admission was, in these circumstances, harmless.

B.

In her second contention on appeal, Hedgepeth maintains that the trial court erred in refusing to admit the written statement she provided to the FBI agents after her arrest. The statement was offered to rebut the prosecution's impeachment of her trial testimony on the basis of her prior inconsistent verbal statements to the agents. As explained below, the trial court's ruling on this issue was well within its discretion.

On direct examination, Hedgepeth testified that she had not participated in *quid pro quo* transactions with Davis. Specifically, she maintained that the "support" she offered for Williams was merely support in the November election, not for an interim Council appointment. The prosecution then impeached Hedgepeth's credibility with her statements to the FBI agents at her post-arrest interview, as recorded in their 302 reports, to the effect that her support had contemplated the interim appointments by Council. Hedgepeth testified that she did not recall making the statements. She then sought to admit into evidence her separate written statement to the agents, given at the same time as the oral interview, which made no mention of the interim appointments by Council. Hedgepeth maintained that this statement showed that, contrary to what the FBI agents had recorded in their 302s, she had not mentioned the interim appointments in her oral statements to them.

The court declined to admit her written statement into evidence, deeming it inadmissible as substantive evidence because it constituted exculpatory hearsay. However, the court permitted Hedgepeth's lawyer to examine her on the inconsistency asserted by the prosecution in her oral statements: whether, in speaking to the FBI, she had admitted that her "support" for Williams related to an interim Council appointment, rather than campaign support in the November general election.

The prior consistent statements of a witness are, as a general proposition, inadmissible as substantive evidence. *See, e.g.*, *United States v. Weil*, 561 F.2d 1109, 1111 (4th Cir. 1977) (explaining that corroborative testimony consisting of prior consistent statements is ordinarily inadmissible hearsay unless testimony sought to be bolstered has first been impeached). However, a prior consistent statement may be admissible under two scenarios. First, under Rule 801(d)(1)(B) of the Federal Rules of Evidence, a prior consistent statement of a person who has testified and been subject to cross-examination is not hearsay and is admissible when the statement is offered to "rebut an express or implied charge against him of recent fabrication, improper influence or motive." *See United States v. Dominguez*, 604 F.2d 304, 311 (4th Cir. 1979) (affirming admission of witness's prior consistent statements where impeachment "was rife with implications that his testimony was improperly motivated" and "fabricated recently"). Second, such a statement may be admitted for rehabilitation purposes, without regard to the provisions of Rule 801(d)(1)(B), if it is consistent with the witness's trial testimony, and other portions of the same statement have been used to impeach the witness, such that "misunderstanding or distortion can be averted only through presentation of another portion" of the statement. In such a situation, the "material required for completion" is admissible, under what has been called the "doctrine of completeness." *See United States v. Mohr*, 318 F.3d 613, 626 (4th Cir. 2003) (explaining and applying doctrine of completeness); *United States v. Ellis*, 121 F.3d 908, 918-20 (4th Cir. 1997) (recognizing that Rule 801(d)(1)(B) is not "only possible avenue" for admitting prior consistent statement).

Although Hedgepeth contends that her written statement should have been admitted in its entirety under the doctrine of completeness, the court's ruling on this point was nevertheless well within its discre-

tion. First, the doctrine of completeness generally applies to a single statement or document; here Hedgepeth sought to admit her separate written statement to clarify the contents of *oral* statements she made during the FBI interview. *See Mohr*, 318 F.3d at 626 (explaining that doctrine of completeness allows admission of portion of document when separate portion of same document has been previously used for impeachment purposes). Second, Hedgepeth's written statement and her alleged oral statements to the agents, as recorded in their 302s, are not contradictory; rather, the 302s merely include statements not contained in the written statement. As a result, even if Hedgepeth's post-arrest statements to the FBI, both oral and written, were considered as one statement, admitting her non-contradictory written statement would not have corrected any distortion of the contents of the oral interview.

Despite this lack of contradiction, the court permitted Hedgepeth's lawyer ample leeway to rehabilitate her testimony by eliciting on redirect examination that she had provided a written statement to the FBI agents, and that the interim Council appointments were not mentioned in that writing. This procedure addressed the concern raised by Hedgepeth, that the Government's impeachment of her had distorted her previous statements, without allowing Hedgepeth to use the prior consistent statement merely to bolster her trial testimony — the very use precluded by the evidence rules. *See Weil*, 561 F.2d at 1111; *see also, e.g.*, *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975) (recognizing general principle that witness's prior unsworn statements are hearsay, and thus typically inadmissible as affirmative proof). As a result, the court's ruling on the evidentiary issue surrounding Hedgepeth's written statement was neither arbitrary nor irrational, and it does not constitute an abuse of its discretion.

## C.

Finally, Hedgepeth contends that the district court denied her the effective assistance of counsel when it refused her request for a continuance of her sentencing hearing. Hedgepeth had requested a continuance based on a psychiatrist report delivered to her lawyer late in the day preceding the sentencing hearing. She maintained that the report suggested the availability of a diminished capacity departure under the U.S. Sentencing Guidelines § 5K2.13 (2003), but that the issue

required further investigation.[12] As explained below, the court did not err in denying her continuance request.

The denial of a continuance contravenes a defendant's Sixth Amendment right to counsel only when there has been "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotation marks omitted); *see also United States v. Stewart*, 256 F.3d 231, 244 (4th Cir. 2001) (quoting *Morris*, 461 U.S. at 11-12). In order to prevail on this point, Hedgepeth is obliged to show, first, that the district court abused its discretion in denying the continuance motion, and second, that the ruling "specifically prejudiced" her case. *Stewart*, 256 F.3d at 244; *see also United States v. Speed*, 53 F.3d 643, 644-45 (1995) (defendant must show that denial of sentencing continuance was arbitrary and substantially impacted her ability to receive fair sentence).

Assessed under the foregoing deferential standard, the trial court did not err in concluding that it was unnecessary to grant a continuance of the sentencing hearing to permit Hedgepeth to investigate the availability of a diminished capacity departure. First, Hedgepeth's July 2, 2004 sentencing hearing had been scheduled by the court three months earlier, in April. This three-month period gave Hedgepeth ample opportunity to investigate and present potential arguments and documentation in her sentencing proceedings. Second, the medical report received the day before sentencing did not demonstrate that further investigation would have revealed a basis for a downward departure. Instead, the report merely indicated that Hedgepeth had been taking Paxil, which her lawyer hypothesized might have affected her mental state, and that she was suffering from depression as a result of several recent and difficult personal problems. The court concluded that the report did not "begin to satisfy the elements" of the demanding diminished capacity Guideline, which authorizes a depar-

---

[12]Hedgepeth's attorney also filed a motion to withdraw as counsel on July 1, 2004, the day before sentencing, which the court denied. Though Hedgepeth argues that a conflict had developed between her and her counsel, further impairing his ability to effectively represent her in the sentencing proceedings, she does not rely on her request for a new attorney as a separate ground for the sentencing continuance error.

ture only when the defendant suffers from a "significantly reduced mental capacity" that "contributed substantially to the commission of the offense." USSG § 5K2.13. Nonetheless, the court at sentencing admitted the testimony of Dr. Shepard regarding Hedgepeth's use of Paxil and its potential adverse neurological effects on her, as well as the evidence of Dr. Israel concerning her mental state, particularly the impact of the personal and family-related stress she had suffered over the previous ten years. As a result, the court's denial of Hedgepeth's request for a sentencing continuance was within its "latitude" and "broad discretion," *Morris*, 461 U.S. at 11, and its ruling did not constitute "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay," *id.* at 11-12, implicating Hedgepeth's Sixth Amendment right to counsel.

## IV.

Pursuant to the foregoing, we affirm Hedgepeth's convictions and sentence.

*AFFIRMED*