**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4549**

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

    v.

IHEANYI FRANK CHINASA,

              Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, Chief District Judge. (3:10-cr-00169-JRS-1)

Submitted: June 19, 2012           Decided: July 24, 2012

Before TRAXLER, Chief Judge, and WILKINSON and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

John O. Iweanoge, II, IWEANOGE LAW CENTER, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Michael C. Moore, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia; Denis J. McInerney, Chief, Fraud Section, Kevin B. Muhlendorf, Trial Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Iheanyi Frank Chinasa appeals his convictions and sentence for crimes arising from a scheme to fraudulently obtain millions of dollars worth of computer parts. Finding no error, we affirm.

## I.

Cisco Systems, Inc., manufactures and sells telecommunications and information technology equipment and related products. It sells products directly as well as through authorized resellers. It also offers warranties for its products, that, depending on the price, entitle the customer to different levels of service or product replacement.

Customers experiencing problems with a Cisco product and in need of technical assistance may communicate with Cisco via telephone or email, or through Cisco's website. Cisco maintains a worldwide network of Technical Assistance Centers (TACs) that process service requests concerning its products. When a TAC receives a service request, a Cisco employee will determine whether the problem can be resolved without replacing the product in question, which is the case 70-80% of the time. If replacement is necessary, then in some cases Cisco's warranty will require a process known as advance replacement, in which

2

Cisco replaces the product in question with a new or refurbished product before the customer has even returned the faulty part.

Robert Chambliss was employed from August 2007 through June 2010 at Packet 360, an authorized reseller of Cisco products based in Glen Allen, Virginia. During that time, Chambliss worked extensively with Cisco equipment, often initiating service requests with Cisco on behalf of Packet 360 clients. Before and during this time, Chambliss also had a side business selling computer equipment on eBay.

Chambliss met Chinasa in 2004 through his side business. Chinasa told Chambliss that he lived in Gaithersburg, Maryland, and ran a business called DataNet Communications. When Chambliss began working for Packet 360, Chinasa asked Chambliss to help him by using warranties purchased for Packet 360 clients to replace malfunctioning Cisco products. Chambliss agreed, using a warranty contract held by Medicorps Health, even though Chinasa had no right to make claims under Medicorps's warranty. Chinasa also eventually purchased his own warranty to use for some returns.

From September 2006 to May 2010, Chinasa and Chambliss initiated hundreds of service requests with Cisco, causing Cisco to ship parts worth millions of dollars. These requests shared many common characteristics. First, each contained a specific complaint that the referenced part was either not responding or

3

not powering up, and that other parts worked in the same chassis. Chambliss had told Chinasa that use of such wording would cause Cisco to send a replacement part instead of trying to resolve the problem through on-line trouble-shooting. Use of that verbiage was important to the scheme because normally only 20-30% of service requests received by Cisco resulted in shipment of a replacement part.

Chinasa and Chambliss had the parts delivered to different addresses in order to avoid detection. Chinasa instructed Chambliss to have the parts shipped to Chambliss's house, to Chinasa, and to Chambliss's friends located in Richmond, Virginia. Chinasa (and others) periodically travelled from Gaithersburg to Chambliss's house to pick up the parts Cisco had sent and to drop off the parts Chambliss was to send to Cisco.

In the fall of 2009, Cisco became aware of Chinasa's and Chambliss's scheme and started tracking their service requests and intercepting parts that they returned. Initial inspections of intercepted parts revealed that the "returned" parts in fact were not genuine Cisco products. Indeed, none of the intercepted parts were found to be genuine Cisco products.

The transactions also contained considerable indicia of fraud. For example, Chambliss often used the warranties purchased for Packet 360 customers even though the product

4

sought was for Chinasa. He also started using a second Cisco user name after Cisco flagged the first one for initiating too many service requests. Additionally, Chambliss did business in the names of shell companies and fictitious entities. Finally, Chambliss had replacement parts shipped to friends' home addresses and to the home address of Zainab Kamara, a DataNet employee.

Chinasa and Chambliss were eventually charged in a superseding indictment with one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C.A. § 1349 (West Supp. 2012) (Count 1); nine counts of mail fraud, in violation of 18 U.S.C.A. § 1341 (West Supp. 2012) (Counts 2-10); two counts of wire fraud, in violation of 18 U.S.C.A. § 1343 (West Supp. 2012) (Counts 11-12); and one count of obstructing an official proceeding, in violation of 18 U.S.C.A. § 1512(c)(2) (Count 13). Chinasa pled not guilty and proceeded to trial.

At the close of evidence, the district court dismissed Count 12 on the government's motion and granted Chinasa's motion to dismiss Count 7. The jury found Chinasa guilty of the remaining counts.

The district court imposed a sentence of 84 months' imprisonment. Chinasa was also held jointly and severally responsible with Chambliss for $18,761,825 in restitution.

5

II.

A.

Chinasa first argues that the evidence was insufficient to support his convictions for conspiracy to commit mail and wire fraud and for the substantive offenses of mail and wire fraud. We disagree.

We must sustain a jury verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). When we undertake this review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted).

The evidence was easily sufficient to prove that Chinasa committed mail and wire fraud and that he and Chambliss conspired to do so. Chambliss explicitly testified that he and Chinasa conspired to defraud Cisco. As Chambliss explained, each of their transactions with Cisco began with, and was based on, a lie that a particular part purportedly was not responding or not powering up. Chinasa gave Chambliss the serial numbers to use, and Chinasa knew the statements Chambliss was making about the parts were false, as Chinasa did not even deliver a

6

part to Chambliss until after Chambliss had filed the corresponding claim. Moreover, the parts Chinasa provided Chambliss to be "returned" to Cisco were counterfeit. And, in light of the evidence that the scheme was a coordinated effort between Chambliss and Chinasa, the jury certainly could have reasonably found that each of the mailings and the wire transmissions on which the substantive counts against Chinasa were based were reasonably foreseeable to Chinasa. See Pinkerton v. United States, 328 U.S. 640, 646-47 (1946).

Chinasa argues that the conspiracy conviction under 18 U.S.C.A. § 1349 should be overturned because the indictment did not allege any overt act in furtherance of the conspiracy and the government did not prove such an act. However, even assuming that Chinasa has properly preserved this issue,[1] § 1349 does not contain any overt act requirement. See United States v. Fishman, 645 F.3d 1175, 1195 (10th Cir. 2011). An overt act is an element under the general conspiracy statute, which requires as an element that one or more of the conspirators "do an[] act to effect the object of the conspiracy." 18 U.S.C.A.

---

[1] The government maintains that the issue is not preserved because Chinasa did not object to the jury instructions in the district court and did not challenge the indictment before trial.

7

§ 371 (West 2000).  Section 1349, however, does not contain equivalent language.  The Supreme Court, construing other conspiracy statutes that do not explicitly state that proof of an overt act is an element, has held that their plain language demonstrates that an overt act is in fact not an element.  See Whitfield v. United States, 543 U.S. 209, 214 (2005) (construing 18 U.S.C. § 1956(h)); Salinas v. United States, 522 U.S. 52, 63 (1997) (construing 18 U.S.C. § 1962(d)); United States v. Shabani, 513 U.S. 10, 17 (1994) (construing 21 U.S.C. § 846).  As the Whitfield Court explained, "Congress has included an express overt-act requirement in at least 22 other current conspiracy statutes, clearly demonstrating that it knows how to impose such a requirement when it wishes to do so."  543 U.S. at 216.[2]

B.

At trial, the government introduced Government Exhibit 14A, a compact disc that contained the service requests and

---

[2] Chinasa cites United States v. Hedgepeth, 418 F.3d 411 (4th Cir. 2005), and United States v. Dozie, 27 F.3d 95 (4th Cir. 1994) (per curiam), for the proposition that commission of an overt act is an element of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349.  However, the statements in Hedgepeth and Dozie indicating that proof of an overt act is an element of conspiracy under § 1349 are merely non-binding dicta.  See Hedgepeth, 418 F.3d at 420; Dozie, 27 F.3d at 97.

shipping information for 557 product returns that Chinasa and Chambliss initiated between 2007 and 2010. Over a defense objection, the government also introduced a compact disc containing a chart prepared by Cisco employee Tony Barberi that summarized the contents of the service requests and shipping information contained in Government Exhibit 14A. The court also admitted: (a) a summary chart establishing the total number of shipments linked with certain user names and shipping addresses, as well as the value of those parts; and (b) a summary chart of transactions specifically charged in the superseding indictment.

Chinasa argues that the district court erred in admitting the summary charts. We review for abuse of discretion a district court's decision to admit evidence. See United States v. Lighty, 616 F.3d 321, 351 (4th Cir. 2010). We find no abuse of discretion here.

Summary charts may be used when they aid the jury in understanding the summarized evidence. See United States v. Loayza, 107 F.3d 257, 264 (4th Cir. 1997). Chinasa contends that the admission of the three charts was improper for three reasons: (1) they were not relevant under Federal Rule of Evidence 401; (2) they were unduly prejudicial under Federal Rule of Evidence 403 as they unfairly suggested that all of the parts underlying the claims were counterfeit; and (3) he was not permitted to inspect every piece of equipment underlying the

9

charts.  None of these reasons warranted excluding the charts, however.

First, the charts were undoubtedly relevant.  If for no other reason, the sheer number of the requests and the use of the shell companies and multiple delivery addresses tended to show Chinasa's intent to defraud.  Chinasa argues that admission of the charts was prejudicial in that they "caused the jury to believe [Chinasa] was responsible for far more fraud than the government was actually able to prove beyond a reasonable doubt."  Appellant's brief at 12.  However, Chinasa does not explain how that was the case.  Barberi specifically testified that the charts do not "contain any representation that any specific transaction is fraudulent."  J.A. 316.  Chinasa's contention that the charts were not admissible because he was not given the opportunity to inspect each of the parts referenced in the charts fails for the same reason.  The charts purported only to summarize Chinasa's service requests and shipping information; they did not purport to provide information about the parts returned to Cisco.

C.

Chinasa next challenges his sentence, specifically the guideline offense-level enhancements he received for loss calculation and leadership role.  Because Chinasa's arguments

10

relate solely to the district court's factual findings concerning the loss amount and leadership role rather than any question regarding the interpretation of the guidelines, we review for clear error only.  See United States v. Miller, 316 F.3d 495, 503 (4th Cir. 2003).

Chinasa first objects to application of an enhancement for leadership role pursuant to U.S.S.G. § 3B1.1(a), which requires a four-level increase in offense level when the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  Chinasa does not challenge the determination regarding the extensiveness of the criminal activity, but he does challenge the finding that he was an organizer or leader. However, the evidence was plainly sufficient to support that finding.  Evidence showed that Chinasa recruited Chambliss to participate in this scheme.  See U.S.S.G. § 3B1.1 cmt. n.4 (explaining that "recruitment of accomplices" is a factor in determining leadership role).  It also showed that Chinasa directed the activities of the other individuals involved in the scheme, including instructing Chambliss what parts to order and where to have them shipped and directing Chambliss to recruit others to sign for parts and to use multiple addresses and business names in shipping the parts.  Chinasa also paid Chambliss.  Indeed, the fact that the conspiracy netted Chinasa

11

parts valued at millions of dollars while Chinasa paid Chambliss only a few hundred thousand dollars is further evidence supporting the enhancement. See U.S.S.G. § 3B1.1 cmt. n.4 (providing that "claimed right to a larger share of the fruits of the crime" is a factor in determining leadership role).

Chinasa's argument concerning the loss amount fares no better. In calculating the loss, the district court estimated the retail list price of the parts obtained in the scheme, then discounted that amount by 40% to reflect the approximate discount that Cisco gives its distributors, which left $20,160,766. Recognizing that this amount was very close to the bottom of the more-than-$20-million-to-$50-million loss range, and noting the possibility that Cisco may have recovered some of its losses by refurbishing some "returned" parts and reselling them, the court gave Chinasa "the benefit of the doubt over into the 7 million to 20 million range," holding him responsible for $18,761,625. J.A. 1012. On appeal, Chinasa does not challenge the correctness of the $20,160,766 figure but maintains that the district court erred in determining that Cisco's loss even exceeded $400,000 in light of the amounts Cisco may have netted by refurbishing some of the parts and reselling them. We disagree.

In calculating loss, the district court need only make a "reasonable estimate." U.S.S.G. § 2B1.1 cmt. n.3(C). Here,

12

the evidence indicated the purpose of the scheme was to use counterfeit Cisco parts to obtain the real thing. Thus, regardless of whether each returned part was individually shown to be counterfeit, the district court had reason to conclude that the vast majority of the "returned" parts were counterfeit and therefore not able to be refurbished and resold. In holding Chinasa responsible for only $18,761,625, the district court certainly gave Chinasa the benefit of the doubt, and Chinasa's responsibility for at least that amount was well supported by the evidence.

## III.

In sum, finding no error, we affirm Chinasa's convictions and sentences. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED