PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

THOMAS EDWARD UZENSKI,
            *Defendant-Appellant.*

No. 04-4136

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Malcolm J. Howard, District Judge.
(CR-02-26)

Argued: December 2, 2005

Decided: January 13, 2006

Before NIEMEYER, GREGORY, and SHEDD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Shedd joined.

## COUNSEL

**ARGUED:** James M. Ayers, II, New Bern, North Carolina, for Appellant. Christine Witcover Dean, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Frank D. Whitney, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

**OPINION**

GREGORY, Circuit Judge:

Thomas Edward Uzenski was convicted by a jury of four counts related to manufacturing and possessing an unregistered firearm, in violation of several provisions of the National Firearms Act (the "NFA"), 26 U.S.C. § 5801 et seq., and a fifth count related to obstructing justice, in violation of 18 U.S.C. § 1503. Uzenski raises several purported errors on appeal, asserting, inter alia, that the district court improperly (1) denied his motion for acquittal based on the insufficiency of the evidence underlying his firearms convictions;[1] (2) denied his motion to suppress; (3) allowed one of the Government's expert witnesses to testify; and (4) admitted evidence of prior bad acts. Finding no merit in any of these contentions, we affirm his convictions. Uzenski also challenges his sentence, which included two separate sentencing enhancements for the abuse of a position of trust and use of a destructive device under the United States Sentencing Guidelines ("Guidelines"). Because we find that Uzenski's sentence violated the Sixth Amendment according to *United States v. Booker*, 125 S.Ct. 738 (2005), we vacate his sentence and remand for resentencing.

I.

At the time of the charged offenses, Uzenski was serving as a detective for the Winterville Police Department ("Winterville PD") in North Carolina. On March 25, 2002 at 10:30 a.m., Sergeant Bobby

---

[1]Uzenski cursorily states a challenge to the sufficiency of the evidence regarding his conviction for obstructing justice, as set forth in Count Five of the superseding indictment, in one of the headers in his brief. However, he did not advance any argument in support of this position either in the brief or at oral argument. Accordingly, we deem this issue abandoned. *Meeker v. Edmunson*, 415 F.3d 317, 325 n.6 (4th Cir. 2005) ("To bring an argument before an appellate court . . . the Federal Rules of Appellate Procedure require a party to offer a written 'argument . . . contain[ing][its] contentions *and the reasons for them, with citations to the authorities* . . . on which the [party] relies.'") (quoting Fed. R. App. P. 28(a)(9) & (b) and adding emphasis).

Braxton received a radio call from Uzenski who asked him to meet him at North Carolina Highway 11 ("Highway 11"), reciting the code "1018" for "urgent." Sergeant Braxton arrived at the scene and saw Uzenski squatting and holding what appeared to be a pipe bomb. The object was a silver pipe with two end caps, black tape, an attached battery, and some mercury. Winterville PD Chief Billy Wilkes, who had overheard the radio call and rushed to the area, approached the officers as Uzenski was still squatting with the pipe bomb in his hands on the grassy shoulder of the highway. Chief Wilkes advised Uzenski to lay the bomb down gently.

After closing down both sides of the highway, Chief Wilkes, Sergeant Braxton, and eight other officers thoroughly searched the immediate area. That afternoon, a bomb squad from the North Carolina State Bureau of Investigation ("SBI") arrived to disarm the device. Special Agent Stuart Campbell confirmed that the device was a pipe bomb. Agent Campbell used the robot to move the pipe bomb approximately ten to fifteen feet from the shoulder of the road to the center lane of the highway. He then donned a protective suit, loaded a special gun, set sandbags around the device, and shot at the device twice at close range with special ammunition rounds. With the first shot, Agent Campbell was able to remove the battery; with the second, he successfully removed one of the end caps.

Agent Campbell then used the robot to inspect the device, which appeared to emanate a grayish black powder with red or pink dots. After the device had been declared safe, SBI Crime Scene Investigator Misty Ellington collected the disarmed device, which consisted of a pipe wrapped in black electrical tape, a glass tube containing mercury that was attached to the pipe, green wires, and a pile of powder. She put the remaining powder in a can and handed all of the items to Uzenski, who was the local case officer on the matter. Meanwhile, Agent Campbell, along with other officers, began investigating the immediate area. They recovered pieces of the battery and wires that appeared to be an electric match.

On March 26, 2002, Special Agent Michael Anderson and Special Agent Ken Andrews of the United States Bureau of Alcohol, Tobacco, and Firearms ("ATF") met with Uzenski and Chief Wilkes. At this time, Uzenski was not a suspect. Uzenski told the agents that

he had discovered the device while performing a routine, on-foot canvassing survey of major highways in the area. Uzenski, Chief Wilkes, Agent Anderson, and Agent Andrews then drove to the site where the device had been discovered. Nearly three yards away from this point, Agent Andrews discovered a second device constructed with a galvanized pipe, which had been threaded on both ends; an end cap with a drilled hole in the middle; and a second, intact end cap. Highway 11 was again shut down, and Agent Andrews contacted Agent Campbell to disarm the device.

Shortly thereafter, Agent Campbell arrived with Special Agent Tim Luper, who proceeded to disarm the device by shooting off an end cap. The agents used the robot to pick up the device, an act which caused a substantial amount of dark powder to fall out. The powder blew down the highway because the winds were very strong that day. Investigator Ellington attempted to collect as much powder as she could, along with the remaining fragments of the device, an end cap, and granulated material. She then turned these materials over to Uzenski.

Following the discovery of the second device, Agent Anderson went to a Lowe's store ("Lowe's") to investigate purchases of galvanized pipes. He received a computer print-out indicating that an individual had recently purchased a one-and-a-half by five-inch galvanized pipe, a two by five-inch galvanized pipe, and end caps two days prior to the discovery of the pipe bombs. A surveillance videotape from Lowe's indicated that this individual had made the purchase on March 23, 2002 at 10:03 a.m. Agent Anderson immediately recognized the person on the videotape as Uzenski.

Agent Anderson spoke with a Pitt County Community Police Officer, who said that Uzenski told him he had built pipe bombs as a young man. On March 29, 2002, Uzenski also told Agent Anderson over lunch that he had built a pipe bomb as a teenager. Apparently, Uzenski had explained to Agent Anderson that:

> He had a PVC pipe and he put two ends on it and cut open two or three shotgun shells and poured the powder in the pipe and used the shoe lace as a fuse and lit the shoe lace and it made a loud boom.

J.A. 70.[2]

On April 24, 2002, Agent Anderson asked Uzenski to discuss the pipe bomb investigation at the SBI Office at 9:30 a.m. the following morning. At that point, Agent Anderson did not tell Uzenski that he was a suspect in the matter. The same day, Agent Anderson submitted a search warrant application before the magistrate judge, seeking to search and seize items from Uzenski's apartment and car. The search warrant application specified two categories of items to be seized and searched: (1) items related to making home-made bombs; and (2) information or data capable of being read by a computer. Upon review of the application, the magistrate judge struck out the request to search and seize the following items:

> Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer-related electronic devices.

J.A. 182. The magistrate judge then signed the search warrant at 3:20 p.m. that day. J.A. 180.

On April 25, 2002 at 9:30 a.m., Uzenski appeared at the SBI Office with Chief Wilkes in response to Agent Anderson's request. SBI Special Agent Ken Basemore first asked Uzenski and Chief Wilkes to check their weapons at the desk or secure them in their vehicle. After so doing, Uzenski and Chief Wilkes returned to the SBI office, where Agent Basemore directed Uzenski to a twenty-one by sixteen-foot conference room with a thirteen-foot table running in the middle. One of the other agents present at the SBI Office intercepted Chief Wilkes to discuss the investigation.

Once alone, Agent Anderson asked Uzenski whether he wanted

---

[2]References to the Joint Appendix shall be cited as "J.A."

any refreshments such as coffee. Agent Anderson then "asked Mr. Uzenski to go ahead and view this video, don't say a word, don't say anything until after the video was completed . . . ." J.A. 73. As the videotape played for six or seven minutes, Agents Anderson and Basemore watched as the veins inside Uzenski's neck expanded. They further observed that Uzenski appeared to be hyperventilating.

After the video concluded, Agent Anderson told Uzenski, "We know who, we know what, we know where, and we know when. The only thing we don't know and want to know is why." J.A. 74. Uzenski acknowledged that he had been at Lowe's on March 23, 2002, but claimed that he had only purchased light bulbs and bug spray. According to Agent Anderson, Uzenski admitted that he was the person identified on the videotape. At approximately 9:50 a.m., Agent Anderson left the conference room and telephoned Special Agent Michael Fanelly, who was conducting the search and seizure at the same time the interview with Uzenski was occurring. Agent Anderson informed Agent Fanelly that Uzenski had denied buying any pipes and claimed that he had merely purchased light bulbs and bug spray.

Agent Anderson asked Uzenski "do you want to give us consent to search your house, your private vehicle, your patrol vehicle, your office" and provided him with a consent form. J.A. 75. According to Agent Anderson, Uzenski stated that he had nothing to hide and signed the consent form. However, Uzenski wanted Chief Wilkes to be present during the search and threatened to revoke his consent. At that point, Agent Anderson handed him a copy of the search warrant, signed by the magistrate judge. Uzenski appeared resigned. Agent Anderson then provided him with a separate consent form authorizing the search and seizure of his computer. Uzenski could not see that the magistrate judge had struck out the provision regarding computers on the original search warrant; nor did Agent Anderson tell him that the warrant did not authorize the search or seizure of his computer. Nevertheless, Uzenski signed the consent form at approximately 10:15 a.m. At that time, Agent Anderson left the conference room and telephoned Agent Fanelly to inform him that Uzenski had consented to the search and seizure of his computers.

At approximately 10:30 a.m. or 10:45 a.m., Agents Anderson and Basemore indicated to Uzenski that they were unaware of any charge-

-either state or federal—that lay against him. At this point, Uzenski began asking whether Chief Wilkes was still at the SBI Office. Agent Anderson located Chief Wilkes, who returned to the conference room at around 11:00 a.m. Agent Anderson apprised Uzenski that he was not under arrest and that he was free to leave at any time. Uzenski acknowledged that he was not under arrest at that time and told Chief Wilkes that he had not had any involvement with the pipe bombs. Chief Wilkes stayed in the conference room for fifteen minutes and then left.

At some point during the interview, Uzenski left the room to use the bathroom, accompanied by Agent Basemore. During most of the interview, both Agent Anderson and Agent Basemore were present and never left Uzenski alone for any significant period of time. Each time Agent Anderson left the conference room, he either closed the door or left it partially cracked open.

At approximately 12:15 p.m., Agent Anderson advised Uzenski that he was under arrest, applied handcuffs, and issued warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Uzenski verbally waived those rights and agreed to further interviewing, although Agents Anderson and Basemore simply brought him to the Pitt County Detention Center.

Meanwhile, Agent Fanelly, accompanied by other agents and detectives, arrived at Uzenski's residence at approximately 10:10 or 10:15 a.m. to execute the search warrant. Prior to conducting the search, Agent Fanelly and the other members of the search team had seen the surveillance videotape obtained from Lowe's. Upon entering the apartment, Agent Fanelly seized three plaid shirts hanging on a coat rack to the left of the front door. Agent Fanelly recognized the shirts as being similar to the distinctive plaid shirt Uzenski had worn in the surveillance videotape. When Agent Anderson made his first telephone call to Agent Fanelly regarding the light bulbs and bug spray, Agent Fanelly noticed a light bulb matching the description in the lamp next to him. Agent Fanelly told the team to search for similar light bulbs. Subsequently, another officer found an identical light bulb in the bedroom. The search team also seized newspapers and assorted paperwork to establish the occupancy of the residence. Two members of the search team found bottles of bug spray under the

kitchen sink and bathroom sink. The search team also recovered a variety of tools, as well as a military ammunition box containing assorted drugs and marijuana drug paraphernalia with police evidence stickers attached to these items. Upon receiving the second telephone call from Agent Anderson regarding Uzenski's consent to the search and seizure of his computer, Agent Fanelly and his search team retrieved the computer.

On May 28, 2002, Uzenski was formally charged in a four-count indictment alleging the following offenses: (1) manufacture of an unregistered firearm on March 25, 2002, in violation of 26 U.S.C. §§ 5822, 5861(f) & 5871; (2) receipt and possession of an unregistered firearm on March 25, 2002, in violation of 26 U.S.C. §§ 5841, 5861(d) & 5871; (3) manufacture of an unregistered firearm on March 26, 2002, in violation of 26 U.S.C. §§ 5822, 5861(f) & 5871; and (4) receipt and possession of an unregistered firearm on March 26, 2002, in violation of 26 U.S.C. §§ 5841, 5861(d) & 5871. On July 22, 2002, Uzenski filed a motion to suppress statements he made during the interview prior to receiving *Miranda* warnings and evidence seized at his residence. After conducting a hearing on the motion, the magistrate judge recommended that the district court deny the motion with respect to the pre-*Miranda* statements, computers, plaid shirts, and electric light bulbs, and grant the motion with respect to the bug spray, insect repellant, and paperwork. Uzenski filed objections to the magistrate judge's findings, set forth in a Memorandum and Recommendation ("M&R"), but the district court adopted the M&R in its entirety.

The case subsequently proceeded to trial on February 11, 2003, and resulted in a mistrial due to jury deadlock. On April 30, 2003, Uzenski filed a motion requesting the laboratory notes of John Bendure, one of the Government's expert witnesses who had appeared at the first trial. In response, the Government moved to have the district court issue an order directing the SBI to produce Bendure's laboratory notes. In an unpublished order dated April 30, 2003 ("April 30, 2003 Order"), the district court granted the Government's motion and directed the SBI to "produce the subject laboratory notes to the Government." J.A. 197.

On May 14, 2003, the grand jury returned a superseding indictment, which contained the four original counts, but added a fifth

count for obstruction of justice, in violation of 18 U.S.C. § 1503. The case again went to trial on October 20, 2003. During its case-in-chief, the Government sought to introduce expert testimony from Bendure, a special agent assigned to the Trace Evidence section of SBI's laboratory, and Robert Carl Valentino, an explosives enforcement officer with the Explosives Technology Unit for ATF, regarding the nature and explosive properties of the two recovered devices. Uzenski objected to Bendure's testimony, asserting that he had never received Bendure's laboratory notes. The district court nevertheless overruled the objection and allowed Bendure to testify regarding forensic explosives and accelerants.

Both of the Government's expert witnesses attested that they examined the remnants of the first device recovered from the March 25, 2002 crime scene—a two by five-inch galvanized pipe, an end cap attached to the pipe, fragments which appeared to be a second end cap, parts of a nine-volt battery, pieces of tape, wiring and debris, a mercury switch attached to the device with black electrical tape, and powder. Through a series of tests, Bendure identified the powder as red dot smokeless gun powder ("red dot powder") used in ten or twenty-gauge shotgun shells. Bendure explained that because the red dot powder had a very high burn rate of ninety-four percent, the powder was very likely to trigger a detonation. Indeed, both Bendure and Valentino concluded that the device could detonate simply if the end caps were screwed off of the pipe. Bendure explained:

> If you get powder in here and caught in the threadings of this material and any metal fragment that sparks off when you try to remove that end cap, this device can go off and explode, detonate, and kill whoever is holding it.

J.A. 624-25. In effect, the pipe and end caps could fragment, functioning as shrapnel, thereby inflicting injury or death to people nearby.

The experts also offered an alternative theory of detonation based on the presence of the rocket model igniter, comprised of the nine-volt battery and two wires, and the mercury switch. Bendure and Valentino testified that the rocket model igniter could generate sufficient electricity to ignite the red dot powder. According to the experts, the mercury switch served as an electrical conduit between the rocket

model igniter and the powder contained in the pipe. Tilting the mercury switch could cause the mercury to flow down inside its glass tubing and "allow[ ] electrical power to flow through the switch," thereby completing the circuit between the battery and the pipe. J.A. 672. In this instance, the mercury switch appeared to be functional and could be easily activated by attaching the wires from the mercury to the electrodes on the switch.

With respect to the second device recovered on March 25, 2002, both experts examined a one-and-a-half by five-inch galvanized pipe with one end cap intact and a dent on the other end where the bomb squad had disarmed the device. Bendure noted that there were several fragments recovered that appeared to be the remnants of the other end cap. Moreover, these pieces had a fair amount of red dot powder on them. Although Bendure admitted that this device did not have a circuit, he concluded that the device was "capable of projecting deadly projectiles" based on the threading mechanism, assuming that the device had been sealed and filled with powder. J.A. 632. Valentino opined that if the device had been filled to one quarter of its capacity with red dot powder, a few grains of the powder in the metal threads could detonate the device. As such, both experts concluded that the second device was also an explosive pipe bomb.

Following the close of the Government's case-in-chief, Uzenski filed a motion for acquittal pursuant to Fed. R. Crim. P. 29, which the district court denied. Uzenski then introduced the expert testimony of Dr. Fredrick William Whitehurst, a forensic chemist formerly employed by the FBI. On direct examination, Dr. Whitehurst testified that an improvised explosive device consists of a container, energetic material, and an initiation device or initiator. In reviewing the first device, Dr. Whitehurst could not determine whether it was an explosive device without knowing more about the qualitative and quantitative properties of the powder, the initiator, and the circuit—details which he could not discern from the exhibits themselves. With respect to the second device, Dr. Whitehurst stated that it needed an initiation mechanism, such as a fuse. Upon cross-examination, Dr. Whitehurst acknowledged that would-be pipe bombers have been injured or killed while constructing a bomb regardless of whether an ignition system was present.

At the close of his defense, Uzenski filed another motion for acquittal, which the district court again denied. On October 24, 2003, the jury returned a guilty verdict against Uzenski on all counts. On February 2, 2004, the district court sentenced Uzenski to a term of imprisonment for sixty months and a term of supervised release for three years for each of the counts, to be served concurrently. Applying the 2003 Guidelines, the district court's sentencing calculation of the total offense level was based in part on (1) a two-level enhancement for "Abuse of Position of Trust or Use of Special Skill," pursuant to § 3B1.3; and (2) a two-level enhancement for use of a "destructive device," pursuant to § 2K2.1(3)(B). Uzenski now appeals.

## II.

Uzenski challenges the sufficiency of the evidence underlying his convictions for Counts One, Two, Three, and Four for manufacturing and possessing an unregistered "firearm" in violation of several provisions of the NFA.[3] Specifically, Uzenski has raised a narrow issue as

---

[3]Counts One and Three charged Uzenski with the unlawful manufacture of a firearm on March 25, 2002, and March 26, 2002, in violation of 26 U.S.C. §§ 5822, 5861(d) & 5871. Section 5822 provides that:

No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

26 U.S.C. § 5822. Section 5861(d) prohibits a person from receiving or possessing a firearm that is "not registered to him in the National Fire-

to whether the evidence at trial supported the jury's conclusions that each of the two devices constituted a "destructive device," which is encompassed within the definition of "firearm," for the purposes of the NFA. For the reasons that follow, we find that the evidence sustains Uzenski's convictions related to each device.

## A.

We review de novo the district court's denial of a motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *United States v. Ryan-Webster*, 353 F.3d 353, 359 (4th Cir. 2003). In assessing the sufficiency of evidence, we must determine whether the jury verdict is sustained by "substantial evidence, taking the view most favorable to the Government." *United States v. Pierce*, 409 F.3d 228, 231 (4th Cir. 2005) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). This inquiry rests on whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir.), *cert. denied*, 537 U.S. 1031 (2002) (internal quotations and citations omitted); *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (*en banc*) ("[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.")

---

arms Registration and Transfer Record." *Id.* § 5861(d). Section 5871 sets forth a maximum fine of $10,000 and a maximum imprisonment of ten years for any violation of the NFA. *Id.* § 5871.

Counts Two and Four charged Uzenski with the receipt and possession of an unregistered firearm on March 25, 2002 and March 26, 2002, in violation of 26 U.S.C. §§ 5841, 5861(d) & 5871. Section 5841(c) provides:

> Each importer, maker, and transferor of a firearm shall, prior to importing, making, or transferring a firearm, obtain authorization in such manner as required by this chapter or regulations issued thereunder to import, make, or transfer the firearm, and such authorization shall effect the registration of the firearm required by this section.

*Id.* § 5841(c). Section 5861(f) also prohibits a person from making a firearm in violation of any provision of the NFA. *Id.* § 5861(f).

Credibility determinations fall within the sole province of the jury, to the extent that we "assume the jury resolved all contradictions in the testimony in favor of the government." *United States v. Sun*, 278 F.3d 302, 313 (4th Cir. 2002) (citing *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998)).

### B.

Section 5845(f) of the NFA defines "destructive device" as follows:

> (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

26 U.S.C. § 5845(f). Uzenski asserts that the evidence fails to establish that either device constituted a destructive device under the definition set forth in subsection (3).[4] In particular, Uzenski contends that

---

[4]Uzenski has limited his challenge to the application of subsection (3), although the superseding indictment does not specify which subsection to apply and the Government appears to rely on both subsections (1) and (3). The distinction between subsection (1), which applies to fully assembled devices, and subsection (3), which applies to a combination of parts, is significant because subsection (3) requires an additional element of subjective intent. *See United States v. Morningstar*, 456 F.2d 278, 280 (4th Cir. 1972) (stating that "subparagraph (1) deals with explosive and incendiary devices which have no business or industrial utility . . . [which] are covered regardless of their intended use"); *United States v.*

the Government failed to prove beyond a reasonable doubt that he had physical possession of the functional parts necessary to convert either device into a destructive device capable of exploding.

At trial, the Government presented two theories of detonation in support of their view that the component parts of the first device could be "readily assembled" into a destructive device. First, both Bendure and Valentino testified that the first device could detonate simply by screwing off the end caps because the powder could interact with the metal threadings of the pipe. Bendure explained that the powder, identified through tests as red dot powder, had a high burn rate and could trigger an explosion if placed in a sealed device with metal threading. The two by five-inch galvanized pipe was, in Bendure's opinion, a particularly dangerous storage device for red dot powder because in screwing off the end cap, a person would be "grinding metal against metal." J.A. 625. In effect, the pipe and end

---

*Lussier*, 128 F.3d 1312, 1315 n.4 (9th Cir.), *cert. denied*, 523 U.S. 1131 (1998) (explaining that Section 5845(f)(3) will apply also to devices that originally have a "legitimate social purpose," but have been converted by the intent to use the device as a weapon); *United States v. Copus*, 93 F.3d 269, 272 (7th Cir. 1996) (stating that "the defendant's subjective intent is relevant to determining whether a 'combination of parts' qualifies as a 'destructive device' under § 5845(f)(3).") (internal citations omitted); *United States v. Curtis*, 520 F.2d 1300, 1303 (1st Cir. 1975) (noting the "line of cases holding that a dynamite charge may become a destructive device if intended for use as a bomb"). The rationale underlying this distinction is that because "'parts' aren't necessarily a weapon," the Government must make a further showing that the defendant intended to use the parts as a weapon. *United States v. Ruiz*, 73 F.3d 949, 951 (9th Cir.), *cert. denied*, 519 U.S. 845 (1996).

Uzenski has not raised the issue of subjective intent on appeal, and as such, we deem it waived. In any event, Valentino's testimony established that neither device held any purpose other than use as a weapon, thereby supporting the inference that Uzenski intended the devices to serve as pipe bombs. Moreover, for reasons stated further in this opinion, we find that the evidence supported Uzenski's convictions for manufacturing and possessing a "destructive device" under subsection (3), and decline to reach whether the evidence also supports the definition of "destructive device" under subsection (1).

caps could expel shrapnel-like fragments upon detonation, thereby inflicting injury or death on the bomber himself or other people. Bendure found no evidence of vaseline on the threadings, which could prevent detonation; nor did the experts find that the drilled holes in the pipe would have deterred an explosion.

Second, the experts testified that the first device could detonate by activating the rocket model igniter, which consisted of the nine-volt battery and attached wires, and the mercury switch. They explained that the battery generated sufficient electricity to ignite the red dot powder, and that the components necessary to form a complete circuit were present. The mercury switch, which served as an electrical conduit between the battery and the powder, appeared to be functional and could be easily activated by attaching the wires touching the liquid mercury to the electrodes on the switch. Both experts concluded that moving the mercury switch could cause the liquid mercury to flow down inside the glass tube, thereby closing the circuit, allowing the electricity to flow from the battery to the powder, and causing detonation of the device. In fact, Bendure noted that some of the material present on the wires appeared to be burned or expended.

We conclude that the evidence underlying the Government's first theory alone amply sustains the jury's finding that the first device constituted a "destructive device" under subsection (3). Both of the Government's experts testified that the explosive qualities of the red dot powder, the metal threadings of the galvanized pipe, and the end caps used to seal the device, when assembled together, constituted a pipe bomb that could detonate and expel shrapnel-like fragments through the simple act of screwing off the end caps. *See United States v. Hammond*, 371 F.3d 776, 780 (11th Cir. 2004) (noting that the statutory definition of "destructive device" could be satisfied by a device "made of metal, steel or cast iron pipe, with caps threaded at each end" and containing explosive powder since "when the pipe ruptured, fragments of it would be propelled like shrapnel against the bodies of those in the vicinity"). Moreover, the alternative theory presented by the Government establishes, at the very least, that the device was capable of exploding based on the presence of the rocket model igniter and the mercury switch. *See United States v. Langan*, 263 F.3d 613, 625 (6th Cir. 2001) (evidence sufficient to satisfy similar "destructive device" provision in 18 U.S.C. § 921 where the experts testi-

fied that the device contained explosive powder and an electric circuit powered by two nine-volt batteries and a mercury switch).

Uzenski nevertheless contends that the testimony proffered by his expert, Dr. Whitehurst, established that the requisite parts were unavailable to convert the device into a destructive device. Dr. Whitehurst testified that he was unable to determine whether the device could detonate without gathering further information regarding the qualitative and quantitative properties of the red dot powder, the initiator, and the circuit. This, he could not do because the bomb squad had necessarily destroyed some of the evidence by disarming the device. However, the Government need only show that the components of the device could be "readily assembled" into a bomb.[5] *Cf. Morningstar*, 456 F.2d at 281-82 (reversing district court's dismissal of indictment and remanding for new trial considering whether four sticks of black powder pellet explosive fastened with electrical tape and unattached blasting caps could be "readily assembled" into bomb); *Langan*, 263 F.3d at 626 (noting that a bomb squad had fragmented the putative pipe bomb at issue, to the extent that the Government's witnesses could not determine whether the circuit could have properly operated, but that, in any event, additional wires could be recrimped easily to cause the device to explode). Indeed, Dr. Whitehurst conceded that a person could be injured while constructing a pipe bomb even if there was no ignition mechanism.[6] *See Langan*, 263 F.3d at 625 (holding that the Government is not required to establish that the destructive device operate as intended).

Admittedly, the evidence fails to establish the precise quantity of

---

[5]Uzenski relies on *United States v. Hamrick*, 995 F.2d 1267 (4th Cir. 1993), for the proposition that the Government must prove beyond a reasonable doubt that the defendant had actual physical possession of every working part necessary to construct a destructive device. Yet *Hamrick* was subsequently vacated by *United States v. Hamrick*, 43 F.3d 877 (4th Cir. 1995) (*en banc*), to the extent that the judgment alone stands.

[6]In this regard, Dr. Whitehurst's testimony did not necessarily conflict with the testimony proffered by the Government's witnesses; to the extent that they contradicted each other, the jury was in any event entitled to determine which experts were more credible. *See Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999).

red dot powder in the first device prior to its disruption by the bomb squad, although Valentino testified that the galvanized pipe had to be filled with powder up to at least one quarter of its capacity in order to explode.[7] Yet several agents present at the crime scene testified that a substantial amount of powder fell out and blew down the road. In addition, Investigator Ellington was able to collect some of the powder in a can for the jury's review. Thus, construing the evidence in the light most favorable to the Government, a rational juror could have properly concluded that the galvanized pipe contained the quantity of red dot powder necessary to detonate it. Accordingly, we find that the evidence supported Uzenski's convictions for Counts One and Two regarding the first device, and affirm those convictions.

For similar reasons, we find that the evidence sustained the jury's conclusion that the second device constituted a "destructive device" under Section 5845(f)(3). The Government's witnesses testified that the second device consisted of a two by five-inch galvanized pipe, an end cap still attached to the pipe, several fragments that appeared to be another end cap, and red dot powder. As had occurred with the first device, a substantial quantity of the red dot powder had fallen out while the device was being disarmed, although a fair amount remained on the resulting pieces. Both of the Government's witnesses thus concluded that the device could detonate based on the explosive qualities of the red dot powder, the metal threading of the galvanized pipe, and the end caps used to seal the pipe.[8] Accordingly, we find that the evidence supported Uzenski's convictions for Counts Three and Four regarding the second device, and therefore affirm those convictions as well.

### III.

Uzenski next challenges the district court's denial of his motion to suppress (1) pre-*Miranda* statements made during his interview on

---

[7]Valentino and Bendure gave varying levels of required powder ranging from one quarter to two thirds of the pipe's capacity.

[8]Indeed, Dr. Whitehurst acknowledged that the second device could explode even without a ignition or initiation system if the end caps were screwed off or if a fuse, such as those found in Uzenski's desk, were placed inside the pipe.

April 25, 2002; and (2) evidence seized during a search of his resi-
dence executed the same day.

### A.

We review a district court's findings of fact for clear error and its
legal conclusions de novo on a motion to suppress. *United States v.
Parker*, 262 F.3d 415, 419 (4th Cir. 2001). Moreover, the evidence
must be construed in the light most favorable to the Government, the
prevailing party below. *United States v. Seidman*, 156 F.3d 542, 547
(4th Cir. 1998). Turning now to the merits of Uzenski's arguments,
we examine the statements and seized articles seriatim.

### B.

Uzenski asserts that the prosecution should have been barred from
using any statements he made during the interview and prior to the
administration of *Miranda* warnings because the officers held him in
custody. In *Miranda*, the Supreme Court set forth prophylactic mea-
sures designed to advise the defendant of his right to remain silent in
securing the Fifth Amendment privilege against self-incrimination.
*Miranda*, 384 U.S. at 444. The prosecution "may not use statements,
whether exculpatory or inculpatory, stemming from custodial interro-
gation of the defendant" unless it demonstrates that the defendant has
first properly received *Miranda* warnings. *Id.* However, *Miranda*
warnings need only be administered when the defendant is in custody.
*Id.*

Custodial interrogation refers to "questioning initiated by law
enforcement officers after a person has been taken into custody or
otherwise deprived of his freedom of action in any significant way."
*Id.* The determination of whether a defendant is in custody is "objec-
tive" and focuses on "'how a reasonable man in the suspect's position
would have understood his situation.'" *Davis v. Allsbrooks*, 778 F.2d
168, 171 (4th Cir. 1985) (quoting *Berkemer v. McCarty*, 468 U.S.
420, 442 (1984)). It is the "compulsive aspect of custodial interroga-
tion, and not the strength or content of the government's suspicions
at the time the questioning was conducted" that implicates *Miranda*.
*Beckwith v. United States*, 425 U.S. 341, 346 (1976) (internal quota-
tions and citations omitted). As such, a custodial interrogation does

not result merely because the "individual is the 'focus' of an investigation," or because the questioning takes place at a police station. *United States v. Jones*, 818 F.2d 1119, 1123 (4th Cir. 1987) (internal citations omitted).

After examining the totality of the circumstances, the district court properly concluded that Uzenski had not been subjected to custodial interrogation, reasoning that:

> The defendant was offered refreshments, he was allowed to leave the questioning room to use the restroom, the door was left partially open at times, there was no evidence of forceful restraint, and importantly, the defendant was told he was not under arrest.

J.A. 191-92. The M&R, which the district court adopted in its entirety, further noted that the agents did not assume a threatening tone towards Uzenski; nor did they brandish weapons.

Set in context, the circumstances surrounding the interview do not indicate the sort of "'*coercive pressures* that can be brought to bear upon a suspect in the context of custodial interrogation.'" *Pasdon v. City of Peabody*, 417 F.3d 225, 228 (1st Cir. 2005) (quoting *Berkemer*, 468 U.S. at 428 and adding emphasis). Although Uzenski contends that the investigating officers subjected him to custodial interrogation by (1) requesting him to come to the SBI office and check his weapon in his car; (2) separating him from Chief Wilkes; and (3) showing him the surveillance videotape and questioning him about the pipe bombs,[9] none of these conditions rises to the level of compulsive or coercive acts attendant with custodial interrogation that *Miranda* sought to address. *See Beckwith*, 425 U.S. at 346. First, Uzenski has not controverted that he voluntarily arrived at the SBI Office and secured his weapon in his patrol car. *Davis*, 778 F.2d at 171 (no coercion where the defendant voluntarily appeared at the police station at their request). Second, the mere fact that the interview took place at the SBI Office and did not involve Chief Wilkes did not convert it into a custodial interrogation. *Jones*, 818 F.2d at

---

[9]Uzenski's fourth contention—that the agents advised him he could not leave—is contrary to the record, as discussed above.

1123. Third, Uzenski has failed to indicate that the showing of the videotape or the questioning unduly restricted his freedom of action. Indeed, Uzenski was permitted to use the bathroom, the door was left partially open at times, and the agents told him he was free to leave at any time. Accordingly, we find that Uzenski was not subjected to custodial interrogation prior to receiving his *Miranda* warnings and therefore affirm the district court's denial of Uzenski's motion to suppress with respect to any pre-*Miranda* statements.

## C.

Uzenski further argues that blanket suppression of the items seized from the search is appropriate because the officers flagrantly disregarded the scope of the warrant and performed a general, unrestricted search.[10] The Fourth Amendment "protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Stevenson*, 396 F.3d 538, 545 (4th Cir. 2005) (quoting U.S. Const. amend. IV). As

[10]Uzenski has apparently resurrected his original blanket suppression argument, which he presented before the magistrate judge in his initial brief on the motion to suppress. Following a hearing on the motion, the magistrate judge requested supplemental briefing, which was not submitted with the Joint Appendix on this appeal. In issuing the M&R, the magistrate judge recharacterized the motion as a motion to suppress "certain physical evidence" and only examined the computer, plaid shirts, bottles of bug spray, insect repellant, and assorted paperwork. J.A. 140. Uzenski then filed objections to the M&R that contested the denial of the motion with respect to the plaid shirts, computer, and light bulbs seized from the residence.

Upon ruling on those objections, the district court denied Uzenski's motion to suppress in part and granted the motion in part with respect to items seized during the execution of the search warrant, which occurred contemporaneously with the interview. The district court, relying on the findings set forth in the M&R, denied Uzenski's motion to suppress in part with respect to three plaid shirts, light bulbs, and the computer seized from Uzenski's residence based on the plain view exception to warrantless searches. The district court granted the motion in part with respect to the bottles of bug spray, insect repellant, newspapers, and assorted paperwork. As such, neither the magistrate judge nor the district court ever issued a formal ruling on the blanket suppression issue.

such, the "search of private property without proper consent violates the Fourth Amendment's prohibition against unreasonable searches unless it has been authorized by a valid search warrant or it falls within certain carefully defined classes of cases that permit warrantless searches." *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004) (internal quotations and citations omitted).

A valid search warrant under the Fourth Amendment must "particularly describ[e] the place to be searched, and the persons or things to be seized." *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001) (internal quotations and citations omitted). This particularity requirement protects against "a general, exploratory rummaging in a person's belongings," to the extent that a valid warrant leaves nothing to the discretion of the officers performing the search. *Id.* (internal quotations and citations omitted). Fourth Amendment protection also extends to the execution of the warrant, such that officers cannot "grossly exceed the scope of a search warrant in *seizing* property." *United States v. Foster*, 100 F.3d 846, 849-50 (10th Cir. 1996) (internal quotations and citations omitted).

Blanket suppression is therefore appropriate where the warrant application merely serves as a subterfuge masking the officers' lack of probable cause for a general search, *see Foster*, 100 F.3d at 856, or where the officers "flagrantly disregard[ ]" the terms of the warrant, *United States v. Chen*, 979 F.2d 714, 716 (9th Cir. 1992). Indeed, blanket suppression is warranted where the officers engage in a "fishing expedition for the discovery of incriminating evidence." *Foster*, 100 F.3d at 850-51 (finding flagrant disregard and granting blanket suppression where warrant only authorized search and seizure for four weapons and marijuana, but DEA agents seized thirty-five items, including firearms, ammunition, and various drug paraphernalia, and state officers seized "anything of value" in the residence); *United States v. Medlin*, 842 F.2d 1194, 1198-99 (10th Cir. 1988) (finding flagrant disregard and granting blanket suppression where officers seized 667 items not specified by the warrant).

Nevertheless, blanket suppression is an "extraordinary remedy that should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." *Robinson*, 275 F.3d at 381 (internal

quotations and citations omitted). Even where officers exceed the bounds of their authority pursuant to the warrant, "[a] search is not invalidated in its entirety merely because some seized items were not identified in the warrant." *Id.* Nor is blanket suppression appropriate where the agents exceed the limits of their authority under the warrant based on practicality considerations or mistake. *See e.g.*, *id.* at 382 (finding no flagrant disregard where most of items seized that were outside scope of warrant were found within items of greater evidentiary value—e.g., a grocery list found within an address book authorized under the warrant); *Chen*, 979 F.2d at 718 (finding no flagrant disregard where agents installed additional surveillance camera based on their mistaken belief that the warrant permitted an extra camera and practicality concerns that the first camera could not capture the entire area).

In this instance, the search warrant specified two categories of items to be searched for and seized:

1) Certain items such as diagrams/books/documentation on how to make home made bombs: initiators, fuses, detonators, explosives or explosive materials including but not limited to dynamite, smokeless gun powder and traces of these materials, batteries, wire, mercury switches, thermostat, containers to include galvanized pipe, PVC pipe, galvanized end caps, PVC end caps, tape, tools, receipts for the purchase of these items and photographs of these items.

2) Any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment. This media includes floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and other media which is capable of storing magnetic coding.

J.A. 58. The search team seized four pliers, an analog multi-tester, four drill bits, red-handled wire cutters, a drill, three plaid shirts, electric light bulbs, bottles of bug spray, insect repellant, newspapers,

marijuana, a military ammunition box containing assorted drugs, marijuana drug paraphernalia, and other assorted paperwork. According to the warrant, the search team only had the authority to seize "tools" such as the four pliers, the analog multi-tester, the four drill bits, the red-handled wire cutters, and the drill.

The issue, therefore, is whether the remaining items fall within recognized exceptions to warrantless seizures. Although neither party directly addresses this issue, blanket suppression certainly cannot stand on items properly seized pursuant to consent. *See United States v. Hylton*, 349 F.3d 781, 785 (4th Cir. 2003). Moreover, officers may properly seize articles of incriminating character that they come across while performing a search in a given area pursuant to a valid search warrant. *Horton v. California*, 496 U.S. 128, 135 (1990). In such "plain view" situations, the police have an original justification for intruding on a person's private property, and can extend that justification to those items whose incriminating nature is immediately apparent. *Id.* at 136. Specifically, officers may seize items unauthorized by a warrant upon three showings:

> First, the seizing officer [must] be lawfully present at the place from which the evidence can be plainly viewed. Second, the officer must have a lawful right of access to the object itself. And [third], the object's incriminating character must . . . be immediately apparent.

*United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir. 1996) (internal citations omitted); *see also United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994).

With respect to the computer, plaid shirts, and light bulbs, we note that Uzenski has not contested the district court's findings that (1) he gave his general consent to search the apartment without unequivocally revoking it; and (2) the officers properly seized (a) the computer pursuant to his own consent, and (b) the plaid shirts and light bulbs pursuant to the plain view exception. We see no reason to disturb the district court's findings, and in any event, Uzenski has waived those issues.

Since Uzenski gave his general consent to search his entire apartment, the other items—such as the marijuana and drug paraphernalia,

which are incriminating on their face—fall within the plain view exception. With respect to the military ammunition box, Agent Fanelly testified at the motion to suppress hearing that the box contained items with attached police stickers, indicating that it had been stolen from an evidence locker. With respect to the bottles of bug spray, insect repellant, and newspapers, the officers mistakenly believed in good faith that these items could incriminate Uzenski. *See United States v. Le*, 173 F.3d 1258, 1277 n.8 (10th Cir. 1999) (suggesting that evidence seized under the plain view doctrine but later found to be non-incriminating does not establish flagrant disregard of warrant). In any event, even if these items were improperly seized, "[t]he exclusionary rule does not compel suppression of evidence properly covered by a warrant merely because other material not covered by the warrant was taken during the same search." *United States v. Borromeo*, 954 F.2d 245, 247 (4th Cir.), *cert. denied*, 505 U.S. 1212 (1992) (internal quotations and citations omitted).

Finding no probative indicia of flagrant disregard or bad faith, we thus conclude that the officers' seizure of certain items outside the warrant did not transform the particularized search into a general, unrestricted fishing expedition. Accordingly, we affirm the district court's denial of the motion to suppress with respect to the items seized from Uzenski's apartment.

Uzenski nevertheless contends that blanket suppression is appropriate based on a purported false statement in the search warrant application regarding the length of one of the pipes. Because he argues this point for the first time on appeal, the issue is subject to the plain error standard set forth in *United States v. Olano*, 507 U.S. 725, 732 (1993), which requires Uzenski to show that (1) there was error; (2) the error was plain; and (3) the error affected his substantial rights. *See United States v. Ruhbayan*, 406 F.3d 292, 301 (4th Cir.), *cert. denied*, 126 S.Ct. 291 (2005). If those conditions are satisfied, "we may then exercise our discretion to notice the error, but only if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 732).

Uzenski claims that the search warrant application falsely stated that the pipe measured two inches in diameter and five inches in length, although the receipt from Lowe's indicated that the pipe at

issue measured six inches in length. The record indicates that Agent Anderson initially measured this pipe as being six inches in length, although he did so without taking off the remaining end cap. After removing the end cap, Agent Andrews determined that the true length of the pipe was five inches. Upon receiving the Lowe's receipt, which showed a purchase of a two by five-inch pipe, Agent Anderson asked Bendure to confirm the length of the pipe, which matched the measurements in the receipt. Uzenski has therefore failed to establish the existence of any error, much less plain error, in the magistrate judge's reliance on the affidavit. Accordingly, we affirm the district court's disposition of Uzenski's motion to suppress in its entirety.

## IV.

Uzenski contends that the district court abused its discretion by (1) admitting Bendure's testimony; and (2) admitting testimony related to (a) prior statements regarding his past attempts to make pipe bombs; (b) false radio calls he had allegedly made while serving as a detective; and (c) an instance in which shots were fired at his police car.

### A.

We review a trial court's evidentiary ruling for abuse of discretion, keeping in mind that the trial court possesses broad discretion in determining the admissibility of evidence. *United States v. Hedgepeth*, 418 F.3d 411, 418-19 (4th Cir. 2005). A trial court abuses its discretion when it acts "arbitrarily or irrationally," fails to "consider judicially recognized factors constraining its exercise of discretion," or "relie[s] on erroneous factual or legal premises." *Id.* at 419 (internal quotations and citations omitted).

### B.

Uzenski asserts that, pursuant to the April 30, 2003 Order, he was entitled to Bendure's underlying laboratory notes, which the Government apparently never provided. Despite this objection, the district court permitted Bendure to testify. We agree with the district court's decision.

Generally, criminal defendants do not have a constitutional right to discovery, absent a statute, rule of criminal procedure, or some other entitlement. *See United States v. Johnson*, 228 F.3d 920, 924 (8th Cir. 2000) (citing *Weatherford v. Busey*, 429 U.S. 545, 559 (1977)). Uzenski concedes that the Government complied with its obligation pursuant to Rule 16(a)(1)(F) of the Federal Rules of Criminal Procedure by handing over Bendure's final report.[11] However, Uzenski has failed to cite any case, statute, or rule of criminal procedure entitling him to *further* discovery regarding Bendure's laboratory notes.[12]

Although Uzenski seeks to rely on the April 30, 2003 Order, the language of the order avoids imposing any direct obligation on the part of the Government. In response to Uzenski's motion for the production of Bendure's laboratory notes, the Government filed a motion seeking an order from the district court requiring the SBI to produce Bendure's laboratory notes. The Government specifically noted in its motion, perhaps artfully so, that "[t]he defendant has requested that the Government supply the actual lab notes" and that "[t]he SBI does not object to the production, but as a matter of its own regulations, requires a court order before it does so." J.A. 193-94. On October 30, 2003, the district court subsequently entered the requested order and

---

[11]Rule 16(a)(1)(F) provides:

> Upon a defendant's request, the government must permit a defendant to inspect and to copy or photograph the results or reports of any physical . . . examination and of any scientific test or experiment if:
>
> (i)    the item is within the Government's possession, custody, or control;
>
> (ii)   the attorney for the government knows—or through due diligence could know—that the item exists; and
>
> (iii)  the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial.

Fed. R. Crim. P. 16 (a)(1)(F).

[12]Uzenski relies on Rule 26 of the Federal Rules of Civil Procedure, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), although neither speaks to the Government's obligation to produce an expert's underlying notes in a timely fashion in a *criminal* case.

directed the SBI to "produce the laboratory notes *to the Government*." J.A. 196 (emphasis added).

Having released the laboratory notes to the Government, the SBI was under no additional obligation to release them to Uzenski. In turn, the Government was not required to release these notes to Uzenski, absent an order from the district court. Yet Uzenski's counsel never filed a subpoena to obtain the laboratory notes, despite being apprised by the Government that it would not release the notes. Nor did Uzenski's counsel request a continuance at trial, indicating that Uzenski had not suffered prejudice by the denial of discovery. *See United States v. Hastings*, 126 F.3d 310, 317 (4th Cir. 1997). In fact, Uzenski has not asserted any basis for finding prejudice, other than to argue that his expert, Dr. Whitehurst, was unable to replicate the testing that Bendure had performed.

We cannot say that the district court abused its discretion by permitting Bendure to testify where Uzenski failed to follow up on his discovery request with the district court, subpoena the records from the Government, request a continuance, or establish any prejudice flowing from the deprivation of access to Bendure's laboratory notes. Accordingly, we affirm the district court's decision to overrule Uzenski's objection to the admission of Bendure's testimony.

## C.

Uzenski also challenges the district court's admission of testimony from several officers related to (1) his prior attempts at making pipe bombs as a teenager; and (2) two instances of prior bad acts. We similarly find no error in the district court's disposition of these matters.

Rule 404(b) states that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show the character in conformity therewith." Fed. R. Evid. 404(b). However, such evidence may be admissible to show other purposes, such as:

> proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, pro-

vided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

*Id.* Generally, Rule 404(b) is understood as a "rule of inclusion." *United States v. Queen*, 132 F.3d 991, 994 and 994 n.3 (4th Cir.), *cert. denied*, 523 U.S. 1101 (1997) (citing cases). The admissibility of evidence regarding prior acts turns on four requirements:

> (1) the prior-act evidence must be relevant to an issue other than character, such as intent; (2) it must be necessary to prove an element of the crime charged; (3) it must be reliable; and (4) as required by Federal Rule of Evidence 403, its probative value must not be substantially outweighed by its prejudicial nature.

*Id.* at 995 (internal quotations and citations omitted).

We first find that the district court properly admitted testimony related to Uzenski's prior attempts at making pipe bombs as probative of knowledge. Indeed, the Government was required to prove that Uzenski knew he was making a destructive device under Counts One, Two, Three, and Four of the superseding indictment. Because the evidence was not admitted solely to show character in conformity therewith, but rather to establish his knowledge in making pipe bombs, and its probative value was not substantially outweighed by its prejudicial nature, the district court did not abuse its discretion in admitting this testimony.[13] *United States v. Sanchez*, 118 F.3d 192, 195 (4th Cir. 1997) (evidence of the defendant's prior dealings admissible under

---

[13]The Government argues that because Uzenski only lodged generic objections to the testimony at issue during trial, this claim was not preserved for appeal. *See* Fed. R. Evid. 103(a)(1) (to preserve an issue for appeal, the party must "make a timely objection or motion to strike . . . stating the specific ground of objection, if the specific ground is not apparent from the context."). Because we find that Uzenski's claim fails even under the lower showing required under the abuse of discretion standard, we need not resolve which standard applies.

Rule 404(b) to show that he was not an "unwitting" participant in the charged drug conspiracy).

We also find that the district court properly admitted Chief Wilkes's testimony related to instances in which Uzenski allegedly made a false radio report and shot at his own police car. On cross-examination, Uzenski's counsel asked Chief Wilkes whether he had performed any background checks on Uzenski. In response, Chief Wilkes admitted that Uzenski had passed both background checks. Uzenski's counsel subsequently asked Chief Wilkes, "Prior to him being charged in this particular case, he was a good officer, correct?", to which Chief Wilkes responded, "I never had any particular difficulty with him, no." J.A. 323. In so doing, Uzenski forfeited the protections set forth in Rule 404(b) by deliberately seeking to depict himself as "one whose essential philosophy and habitual conduct in life is completely at odds with the possession of a state of mind requisite to guilt of the offense charged." *United States v. Johnson*, 634 F.2d 735, 737 (4th Cir. 1980) (evidence of prior fraudulent Medicare receipts admissible to controvert defendant's claim that she lacked the mens rea to commit offense charged). The prosecutor was then entitled to question Chief Wilkes regarding the false radio report and alleged shooting to counter Uzenski's attempt to portray himself as a "good officer." Accordingly, we affirm the district court's decision to admit this testimony as well.

V.

Finally, Uzenski contends that the sentence he received violates the Sixth Amendment because the district court, in applying the Guidelines, imposed (1) the two-level enhancement for "Abuse of Position of Trust or Use of Special Skill," pursuant to § 3B1.3; and (2) the two-level enhancement for use of a "destructive device," pursuant to § 2K2.1(3)(B). Specifically, Uzenski asserts that the district court necessarily relied on judicial factfinding to justify both enhancements. The district court ultimately imposed a sentence of sixty months' imprisonment for all counts (to run concurrently), based on a total offense level of twenty-four and a criminal history category of I. The Government concedes that the sentence must be vacated and remanded for resentencing based on the enhancement for "Abuse of Position of Trust or Use of Special Skill."

Because Uzenski did not raise these issues before the district court, we review the sentence for plain error. *Olano*, 507 U.S. at 732; *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005) (internal citations omitted). Under *Hughes*, which is this Circuit's application of *Booker*, a Sixth Amendment error occurs where "a sentence exceed[s] the maximum based on facts found by the jury." *Id. Hughes* declares such error to be "plain" because although Uzenski could not have asserted a Sixth Amendment claim on this ground pursuant to Fourth Circuit law at the time of his sentencing, *see United States v. Kinter*, 235 F.3d 192 (4th Cir. 2000) and *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004), *Booker* abrogated that previously settled law. *Hughes*, 401 F.3d at 547. The error "affects" a defendant's substantial rights where he establishes that "the sentence imposed by the district court as a result of the Sixth Amendment violation was longer than that to which he would otherwise be subject." *Id.* at 548 (internal quotations and citations omitted). Finally, we notice the error "when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 555 (internal quotations and citations omitted).

Uzenski's sentence violated the Sixth Amendment because it was based, in part, on judicial factfinding necessary to support the two-level enhancement for "Abuse of Position of Trust or Use of Special Skill." This error substantially affected Uzenski's rights, since he was sentenced to sixty months' imprisonment, which was higher than the range of forty-one to fifty-three months authorized by the facts found by the jury or admitted by Uzenski. As such, we notice the error because the failure to do so would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Hughes*, 401 F.3d at 555 (internal citations omitted).[14] Accordingly, we hold that the sentence must be vacated and remanded for resentencing in accordance with *Hughes*.[15]

---

[14]In addition, we find that Uzenski's timeliness challenge to the Government's request for a sentencing enhancement based on "Abuse of Position of Trust or Use of Special Skill" is therefore moot.

[15]We of course offer no criticism of the district judge, who followed the law and procedure in effect at the time of Uzenski's sentencing.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*