**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4366**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CARMEN JOHNSON,

Defendant – Appellant.

**No. 15-4379**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CARMEN JOHNSON,

Defendant – Appellant.

Appeals from the United States District Court for the District of Maryland, at Greenbelt. George J. Hazel, District Judge; Deborah K. Chasanow, District Judge.  (8:13-cr-00294-GJH-3; 8:14-cr-00352-GJH-1)

Argued:  October 26, 2016                                    Decided:  April 3, 2017

Before GREGORY, Chief Judge, WYNN, Circuit Judge, and DAVIS, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Andrew Brooks Greenlee, ANDREW B. GREENLEE, P.A., Sanford, Florida, for Appellant. Kristi Noel O'Malley, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

These appeals arise out of a seven-day trial, in consequence of which a jury convicted Carmen Johnson ("Johnson") of (1) two counts of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) twelve counts of wire fraud, in violation of 18 U.S.C. § 1343; and (3) ten counts of making false statements on loan applications, in violation of 18 U.S.C. § 1014. On appeal, Johnson lodges the following challenges to her conviction and sentence: (1) the denial of her request for an evidentiary hearing on, and the denial on the merits of, her motion for release of funds held by the Government after their pre-indictment seizure, assets allegedly required for Johnson to retain counsel; (2) the denial of her motion for a continuance; (3) the sufficiency of the evidence supporting her convictions; and (4) the calculation of the loss amount attributable to her offense conduct. Finding no error, we affirm the judgment.

I.

Johnson's appeals embrace two indictments that the district court consolidated for trial. We summarize the separate but substantially overlapping facts uncovered in the antecedent investigations and, ultimately, proven at trial, in the light most favorable to the jury's verdict.

A.

Between February 2003 and July 2011, Johnson operated a so-called credit repair business known as Able Estate & Company LLC ("Able Estate"). In this role, Johnson had the ability to submit information regarding loans or lines of credit, known as tradelines, to Experian, the international credit reporting agency. Johnson fraudulently

3

reported that Able Estate extended credit or loans to Able Estate's clients. Johnson backdated the fictitious tradelines to create the appearance that the purported credit or loans had been significantly repaid in order to improve the credit profiles of the clients. In exchange, the clients paid Able Estate, that is, Johnson, a fee typically between $1,200 and $2,400.

Able Estate reported 2,850 tradelines to Experian between May 2004 and July 2006. In July 2006, suspecting Able Estate of fraud, Experian suppressed all Able Estate tradelines and reported the activity to the United States Secret Service, which opened an investigation. Meanwhile, Johnson began to use a company called Restoration One and reported 422 tradelines on behalf of Able Estate clients. Johnson hired a woman named Shirley Walker to report the fraudulent tradelines in order to avoid detection by Experian. In June 2009, suspecting Restoration One of fraud, Experian suppressed these tradelines as well. Johnson formed a third company called CJ Lending. Concealing her identity as one of the transmitters of data at CJ Lending, Johnson reported 2,229 tradelines to Experian between November 2007 and April 2008. Experian later suspected fraud and suppressed these tradelines as well.

In addition to the fraudulent credit histories described above that Johnson reported on behalf of over 2,000 clients, between March 2007 and November 2008, Johnson conspired with two licensed real estate agents to enhance the value of fraudulent real estate purchases by helping to fashion false statements (i.e., regarding purchasers' credit worthiness) on loan applications and sales contracts. Collectively, the conspiracies

4

involved at least ten different real estate transactions. At issue on appeal are the convictions based on the real estate schemes.

## 1.

In Case 13-cr-00294 ("Case 13-294"), Johnson, real estate agent Edgar Tibakweitira ("Tibakweitira"), and several other co-conspirators used false identities and false credit information to obtain mortgage loans to purchase residential properties. The identities Tibakweitira selected to use as straw buyers were often individuals located in Tanzania. Tibakweitira paid Johnson to fabricate credit histories for the straw buyers in order to ensure that they had sufficient credit to qualify for a mortgage loan. Tibakweitira then submitted Uniform Residential Loan Applications to lenders that included the fabricated credit histories so that the loans would be approved. Tibakweitira also created false addenda to the sales contracts, representing that Destiny Property Management, LLC did renovations to residential properties, when in fact Destiny never did any renovations. This caused the lending banks to disburse funds at the closings based upon inflated appraisals of the property values. Johnson, Tibakweitira, and the conspirators shared in the proceeds generated by the scheme.

## 2.

In Case 14-cr-00352 ("Case 14-352"), Johnson and real estate agent Nsane Phanuel Ligate ("Ligate") used false identities and false credit information to obtain mortgage loans in a similar scheme. Ligate reported that Xavier Engineering and Construction Company, a company owned by a co-conspirator, completed restorations to

the properties. In reality, Xavier Engineering never worked on the properties, and the conspirators pocketed the proceeds generated by the mortgage loans.

B.

Early in the Government's investigation of Johnson's ongoing criminal activities, on March 23, 2011, the Government sought and obtained a seizure warrant pursuant to 21 U.S.C. § 853(p) as part of the investigation centered specifically on Able Estate's and CJ Lending's interactions with Experian. The Government averred in the affidavit supporting the warrant application ("the March 2011 affidavit") that it would seek a money judgment in a "forthcoming indictment" and that there was probable cause to believe that up to $2 million from Able Estate's accounts at specified financial institutions were forfeitable. J.A. 52. A United States Magistrate Judge issued the warrant and agents seized $515,967.64 from certain bank accounts of Able Estate and CJ Lending.

Days later, agents executed a separate warrant and searched the premises in which Johnson's companies were located. During the execution of the search warrant, agents located loan files for properties that showed lines of credit from CJ Lending or Restoration One. In some cases, these files contained records showing that the identities used to purchase properties possessed no credit histories at all and were based on fabricated tradelines. Apparently, it was through this confluence of investigative activity that the separate indictments, later consolidated for trial, took shape. To a significant extent, one of the disputes in this appeal is whether either of the two indictments pursuant to which the jury convicted Johnson was the "forthcoming indictment," *supra*, alluded to

6

in the March 2011 affidavit supporting the seizure warrant. As explained within, we conclude that neither was. *See infra* pp. 11–14.

C.

On June 10, 2013, more than two years after the warrants were executed, Johnson was first indicted, together with six others, in Case 13-294, based on allegations of a wide-ranging mortgage fraud/property flipping scheme, involving eight distinct real estate transactions, as summarized above.[1] The indictment included a forfeiture allegation.

In the course of pre-trial proceedings in Case 13-294, on December 19, 2013, Johnson filed a motion for release of the funds that had been seized from the accounts of Able Estate and CJ Lending in March 2011. Acting through retained counsel, Johnson claimed that she did not have the funds to pay for her legal representation. According to Johnson, she was entitled to the seized funds because they were "untainted" assets she should be permitted to use to fund her defense. J.A. 35.

In a somewhat confusing series of contentions and revised contentions submitted thereafter, ably and conscientiously unraveled by the district court, the Government first took the position that Johnson failed to make a threshold showing that she was entitled to a hearing. The Government also noted that the seizure was effected in a separate investigation. Later, the Government filed a supplemental response to Johnson's motion

---

[1] In 2014, Johnson was the lone defendant indicted in Case 14-352, which involved substantially identical allegations as those in Case 13-294, and covered an additional two real estate transactions. Johnson was the sole defendant in either of the indictments to go to trial.

7

asserting that because the assets were seized pursuant to an investigation that was separate and legally distinct from that underlying the indictment returned in Case 13-294, their seizure and detention could only be challenged through a Rule 41(g) motion. *See* Fed. R. Crim. P. 41(g). The Government also argued for the first time that although the March 2011 affidavit characterized the funds in the targeted accounts as "substitute assets" under 21 U.S.C. § 853(p), J.A. 52, this representation was a mistake. The Government explained that the funds were not in fact "substitute assets" as the March 2011 affidavit asserted, but were instead proceeds "directly traceable to criminal activity" (i.e., the fees paid by clients of Able Estate and CJ Lending as compensation for the fraudulently enhanced credit profiles) and were therefore tainted assets. J.A. 81.

On February 27, 2014, the district court held a non-evidentiary hearing on the motion for release of funds. Ultimately, after receiving supplemental, post-hearing briefing from Johnson, the district court denied Johnson's motion for an evidentiary hearing and, on the merits, for the release of funds, in a comprehensive memorandum opinion. *See United States v. Johnson*, 2014 WL 2215854 (D. Md. May 28, 2014). The court found that because the seizure was effected pursuant to a separate investigation from that leading to the indictment in Case 13-294, Rule 41(g) was the appropriate procedural mechanism by which Johnson's claim to a return of those funds was to be assessed. *Id.* at *5. In the court's view, the March 2011 affidavit provided an ample basis for the magistrate judge's finding of probable cause and the Government had easily and quite readily satisfied the relevant standards. *Id.* at *6.

8

Subsequently, Johnson's retained counsel moved to withdraw and the motion was granted; Johnson elected to proceed *pro se*. The district court appointed Anthony Martin, Esq., as standby counsel on August 8, 2014, and Martin agreed that he would be prepared to represent Johnson at trial. The district court conducted a hearing pursuant to the holding of *Faretta v. California*, 422 U.S. 806, 832 (1975), on August 13, 2014, and again informed Johnson that Martin could represent her during a status call on September 16, 2014.

From October 20, 2014 to February 10, 2015, the court delayed trial. Much of the delay was to provide sufficient process to ensure that Johnson understood her rights and was competently deciding to proceed *pro se*. The district court conducted a further *Faretta* hearing on December 5, 2014 and also ordered a competency evaluation. The district court ultimately found Johnson competent to proceed, and it determined she had knowingly and voluntarily waived her right to counsel. On February 3, 2015, the district court held a pretrial conference in which the court informed Johnson of the risks of self-representation, and it warned that "Mr. Martin should certainly be prepared to take over if . . . requested to do so." J.A. 348. The court also stated that no continuance would be granted.

On February 6, 2015, four days before the scheduled start of trial on what by then was the fourth superseding indictment in Case 13-294 (consolidated with the indictment in Case 14-352), Johnson asked Martin to represent her. Martin requested a continuance, explaining that he had not yet reviewed the evidence. The court denied the requested continuance and trial proceeded as scheduled. After the close of the Government's case-

9

in-chief, and after the close of her defense, Johnson moved for judgment of acquittal, which the district court denied.

On February 20, 2015, the jury convicted Johnson on all of the 24 counts submitted to it for consideration, including: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud, in violation of 18 U.S.C. § 1343; and (3) making false statements on loan applications, in violation of 18 U.S.C. § 1014. On June 3, 2015, the district court sentenced Johnson to concurrent terms of 57 months' incarceration followed by concurrent terms of five years' supervised release and ordered restitution of $2,315,660.94 to be paid jointly and severally by all related defendants. Johnson filed post-trial motions challenging, among other issues, the court's denial of her request for a continuance. The court denied Johnson's post-trial motions, and Johnson timely appealed.

II.

We begin by addressing Johnson's contention that the district court erred in denying her motion for return of her seized assets with which she intended to retain counsel. We review the district court's factual findings for clear error. *Hensley v. Alcon Laboratories, Inc.*, 277 F.3d 535, 541 (4th Cir. 2002).

There are several steps to Johnson's argument that she was entitled to release of the seized assets. First, she asserts the court was wrong to apply Rule 41(g) because the assets were seized pursuant to the same investigation that gave rise to the indictment she faced at the time she filed her motion, and because Rule 41(g) should not apply when a defendant needs the seized funds to pay for counsel. Second, she argues that under the

10

standards established by *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001), she met the threshold requirements for an evidentiary hearing because: (1) the funds were untainted according to the allegations in the March 2011 affidavit; and (2) she needed the funds to pay for her legal representation. Thus, Johnson contends, she was entitled to an evidentiary hearing to test the probable cause determination underlying the initial restraint of her assets. We address, and, as explained within, reject, Johnson's contentions in turn.

## A.

Johnson first asserts that the district court applied the wrong standard in assessing her entitlement to an evidentiary hearing and to relief on the merits of her motion. Johnson argues that there is so much overlap between the facts articulated in the March 2011 affidavit in support of the seizure warrant and the facts in the case for which she was later indicted and tried, that the seizure was not effected in a separate investigation; she urges us to conclude that both the seizure and her convictions occurred in the same case. Therefore, she reasons that when she filed her motion, she was actually under indictment and the (more stringent) *Farmer* test should apply instead of the (less exacting) *Richey* test.

The Government responds that the funds that Johnson sought were seized pursuant to a separate investigation from that giving rise to Cases 13-294 and 14-352, an investigation that did not focus on the fraudulent real estate transactions involving Tibakweitira and Ligate, but, instead, on credit enhancement on behalf of Johnson's clients. Johnson responds that the likely existence of the Government's yet-to-be-

indicted third case that has now been forthcoming for more than five years "strains credulity." Appellant's Reply Br. 3.

District courts apply a different legal analysis to a motion for a return of property depending, in part, on whether prosecution has begun. If the restraint of property occurs pre-indictment, a defendant's relief can come only under Federal Rule of Criminal Procedure 41(g). Rule 41(g) provides: "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). "A Rule 41(g) motion is properly denied if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture or the government's need for the property as evidence continues." *Jackson v. United States,* 526 F.3d 394, 396 (8th Cir. 2008) (quoting *United States v. Vanhorn*, 296 F.3d 713, 719 (8th Cir. 2002)) (internal quotation marks omitted).

Under *Richey v. Smith*, 515 F.2d 1239 (5th Cir. 1975), courts faced with a Rule 41(g) motion consider a four-factor test. *See also Ramsden v. United States*, 2 F.3d 322 (9th Cir. 1993) (describing and adopting the *Richey* test). The test includes consideration of:

> 1) whether the Government displayed a callous disregard for the constitutional rights of the movant; 2) whether the movant has an individual interest in and need for the property he wants returned; 3) whether the movant would be irreparably injured by denying return of the property; and 4) whether the movant has an adequate remedy at law for the redress of his grievance.

*Id.* at 325 (citing *Richey*, 515 F.2d at 1243–44).

12

On the other hand, if the continued restraint of untainted assets occurs post-indictment, courts in this Circuit apply the "*Jones-Farmer*" rule, derived from the Tenth Circuit's approach in *United States v. Jones,* 160 F.3d 641 (10th Cir. 1998), and the Fourth Circuit in *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001). In *Farmer*, the defendant's assets were seized pursuant to civil forfeiture order prior to his indictment. *Id.* at 801. Farmer "argued that he had a Sixth Amendment right to use his legitimate property to hire the attorney of his choice and that he had been deprived of that right without a meaningful opportunity to be heard in violation of the Due Process Clause." *Id.* at 802. The district court denied Farmer's motion. *Id.* at 801. On appeal, we held that due process requires a pretrial adversary hearing when a defendant makes a threshold showing that the Government may have seized untainted assets and that the defendant needs those assets to hire counsel. *Id.* at 805. The court explained that "a brief hearing will provide an opportunity for Farmer to prove by a preponderance of the evidence that the government seized untainted assets without probable cause and that he needs those same assets to hire counsel." *Id.* Johnson insists that *Farmer*'s reasoning controls in the circumstances presented here and that she should have been afforded an evidentiary hearing in her efforts to demonstrate that some of the seized funds were free of taint.

Generally speaking, Johnson committed fraud by falsely reporting credit histories through the same companies as those employed in the real estate schemes. Thus, the facts at issue in each investigation are somewhat similar and overlapping. However, the conduct at issue on this appeal relates specifically to her conspiracy to commit fraud in

13

conjunction with the real estate agents Ligate and Tibakweitira, and not the agreements she made with more than 2,000 clients to falsify their credit for a fee. The March 2011 affidavit describes CJ Lending reporting fictitious tradelines on behalf of its users. Specifically, the affidavit attests to the following facts:

> On July 15, 2009, agents of the Secret Service were provided with documentation from the Experian Credit Reporting Bureau indicating that the credit profiles of hundreds of individuals had been fraudulently enhanced due to the transmission of false data from CJ Lending, LLC to Experian. This false data led to the creation of tradelines giving the appearance that an individual, hereinafter referred to as an "end-user", had been extended a line of credit or an installment loan from CJ Lending, LLC.

J.A. 55. Ligate and Tibakweitira were never mentioned in the March 2011 affidavit, nor is any conspiracy involving real estate transactions.

We conclude that the district court did not clearly err when it found that the March 2011 seizure was pursuant to the investigation for which Johnson had not yet been indicted at the time she filed her motion for release of funds.

B.

Johnson further argues that *Farmer* should apply even if the investigations are separate. According to Johnson, because the March 2011 affidavit describes the assets as substitute assets, they were not derived directly from criminal activity, and therefore were "untainted." Appellant's Br. 9. The Government responds that the term "substitute assets" was a drafting error and the assets were actually the proceeds of Johnson's unrelated crimes. Appellee's Br. 10.

14

The Government initially seized Johnson's assets in 2011, and admitted in its warrant application that the assets were substitute and pending a criminal indictment. In 2014, the night before the district court's hearing, the Government changed course and argued that the assets at issue were in fact criminal proceeds. At the hearing, the Government further stated that its 2011 and current investigations were separate and that the indictment in Johnson's 2011 investigation was forthcoming. It has now been more than three years since that statement, and almost six since the seizure. Still we have seen no indictment.

When the district court examined these exact facts, it concluded that Johnson had no right to a hearing, in part because she failed to provide any evidence, other than her assertion, that any of her assets were untainted. *See* J.A. 184–85 (finding in the district court that, despite Johnson's arguments, the warrant seizing assets was supported by probable cause that all of seized property was forfeitable as criminal proceeds). The district court did not clearly err in so finding. While *Richey* applies when no indictment exists, and *Farmer* certainly applies when the seizure arises from the same investigation as the indictment, this Court has not yet determined which standard applies when a defendant is under indictment and needs to pay for counsel using allegedly untainted funds seized in a separate investigation. Yet the district court did not clearly err in finding that Johnson was not entitled to a hearing under *Richey*. The record also demonstrates that Johnson failed to make a prima facie showing that her assets were untainted, so she is not entitled to a hearing under *Farmer*. Because Johnson cannot receive a hearing under either standard, we need not determine which applies here.

15

We do not hesitate to remind the Government that words matter and that the language "substitute assets" has important implications under the relevant statutory framework and cannot be summarily dismissed as "inartful[] draft[ing]." J.A. 123. *Compare* 21 U.S.C. § 853(p) (providing for criminal forfeiture of substitute property), *with id.* § 853(a)(1) (providing for criminal forfeiture of "property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation"). *See generally United States v. McHan*, 345 F. 3d 262, 267–672 (4th Cir. 2003) (discussing the difference between funds seized as substitute assets and funds seized as proceeds of criminal conduct). *See also Luis v. United States*, 136 S. Ct. 1083, 1091 (2016) (explaining that the statutory background of § 853 informs the distinction between tainted and untainted assets and observing that the distinction is "an important one, not a technicality"). The Government's mischaracterization of the assets as substitute assets in the March 2011 affidavit is not a trivial typographical error in the context of this case.

Still, this is far from a case in which the affidavit lacked a showing of probable cause to believe that the assets (or any of them) were in fact tainted. According to the affidavit, statements from witnesses, copies of CJ Lending and Able Estate documents, and bank records all indicated that customers typically paid $1,200, $1,600, or $2,400 fees that were deposited into CJ Lending and Able Estate accounts in exchange for fraudulent credit enhancements. The affidavit declares: "The government intends to seek a money judgement in the forthcoming indictment for at least $2,000,000.00 in U.S. currency, which is an amount that represents the proceeds of the criminal activity." J.A.

16

52. The affidavit further states that the "investigation has revealed no evidence that CJ Lending and Able Estate & Company have generated any legitimate earnings by lawfully extending loans or credit." J.A. 64. Thus, the district court committed no error when it concluded that the Government had probable cause to seize all of Johnson's assets as tainted funds.

The bottom line is that Johnson had no right to use illegally obtained funds to hire an attorney. *Caplin & Drysdale v. United States*, 491 U.S. 617, 624–33 (1989); *United States v. Monsanto*, 491 U.S. 600, 615–16 (1989). A hearing under *Farmer* is limited to a defendant's challenge to an "erroneous deprivation" of funds. 274 F.3d at 804. Most recently, in *Luis*, the Supreme Court found that the pretrial restraint of assets needed to retain counsel violated the Sixth Amendment when the assets were *not traceable* to a crime or obtained *as a result* of a crime. 136 S. Ct. at 1088. Yet Johnson has failed to sufficiently show that her deprivation was erroneous, or that her assets were untainted. As a result, these cases do not guarantee her a right to a hearing.

For these reasons, we conclude that the district court did not err in denying Johnson's motion seeking return of the seized assets, or in declining to conduct an evidentiary hearing on such motion.[2]

---

[2] In light of our conclusion, we need not address Johnson's assertion that she needed the seized funds to pay for her legal representation. As an aside, we observe that, without objection by Johnson, the district court entered an order of forfeiture during the pendency of this appeal, and all of the funds seized pursuant to the March 2011 affidavit were credited against Johnson's obligation to pay restitution in this case.

17

III.

Johnson next contends that the district court erred in denying her motion for a continuance. As a result, she claims, her standby counsel did not have sufficient time to prepare for a trial of this complexity when she asked him to resume representation of her days before trial.

This Court reviews for abuse of discretion the district court's denial of a continuance. *United States v. Williams*, 445 F.3d 724, 739 (4th Cir. 2006). In addition to demonstrating an abuse of discretion, the defendant must also show that the denial of a continuance specifically prejudiced her case. *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005). While an arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the defendant's right to the assistance of counsel, district courts have broad discretion in determining whether to grant a request for a continuance. *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

Here, the district court's denial of the continuance was reasoned and well within the bounds of discretion. The court repeatedly urged Johnson that she should not represent herself and warned her that she would not be permitted a continuance. Nevertheless, Johnson did not request counsel until four days before trial. Martin then requested a continuance and argued that he had insufficient time (owing to obligations to other clients) to prepare for trial, despite the fact that he first received notice in August 2014 and the trial had been repeatedly delayed. While Johnson asserts that the court effectively denied her right to counsel by providing insufficient time to prepare, the

18

Government correctly points out that any lack of preparation for trial was caused by Johnson and her attorney. *See United States v. West*, 877 F.2d 281, 287 (4th Cir. 1989) (finding no abuse of discretion where the district court denied a continuance, citing the need for some limit to a *pro se* defendant's ability to manipulate the judicial system). Martin was on notice that he may need to represent Johnson at any point and had six months prior to the trial date to prepare. *See United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995) (finding no abuse of discretion where replacement counsel was notified of his appointment to represent the defendant less than a month before the trial was scheduled to begin). Furthermore, Johnson fails to establish prejudice. *See United States v. Badwan*, 624 F.2d 1228, 1231 (4th Cir. 1980) (upholding the denial of a motion for continuance where defense counsel argued the complexity of the case required additional time, but failed to identify concrete prejudice). As the district court noted, Martin provided Johnson a "vigorous defense" and challenged the Government's witnesses during cross-examination. J.A. 1970. In addition, Johnson presented three of her own witnesses. We fail to see how Johnson would have developed additional defenses with more time. Accordingly, we conclude that Johnson has failed to show that the district court abused its discretion in denying her motion for continuance.

IV.

Johnson next challenges the sufficiency of the evidence supporting her convictions. We review de novo the district court's denial of a motion for judgment of acquittal and we sustain the verdict if there is substantial evidence to support it. *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012). "We have defined substantial

evidence as evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (citation and internal quotation marks omitted). Thus, "[a] defendant bringing a sufficiency challenge must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." *Engle*, 676 F.3d at 419 (citations and internal quotation marks omitted).

To convict a defendant of conspiracy to commit wire fraud, the Government must prove beyond a reasonable doubt that the defendant knowingly and voluntarily participated in the conspiracy. *United States v. Hackley*, 662 F.3d 671, 678–79 (4th Cir. 2011) *as corrected* (Dec. 20, 2011). The Government need not prove that a co-conspirator knew "all of the details of the conspiracy," only that the co-conspirator knew "the essential object." *United States v. Goldman*, 750 F.2d 1222, 1227 (4th Cir. 1984).

In this case, the jury was properly instructed that to find Johnson guilty of conspiracy, it had to find that (1) "two or more persons entered the unlawful agreement charged in the indictment;" and (2) "that the defendant knowingly and willfully became a member of the conspiracy." J.A. 1725. The jury was also properly instructed that "[t]he unlawful agreement charged in the indictment is an agreement to devise a scheme to defraud lenders of money by fraudulent means, which scheme affected financial institutions." *Id.*

Johnson maintains, wholly without support, that the evidence presented at trial was insufficient to establish that she was a knowing and willing participant in a

20

conspiracy to defraud lenders because she did not know the purpose of the conspiracy. Johnson's position boils down to a claim that she submitted false credit reports at the request of real estate agents without understanding to what end they would be used.

When viewed in the light most favorable to the Government, substantial evidence was presented for a rational jury to conclude that Johnson was actively engaged in a fraudulent scheme to pull money out of real estate transactions. Johnson furthered the object of the conspiracy by ensuring that buyers' false credit information would be transmitted to lenders through inclusion on credit reports. Although Johnson's role was limited, it was nonetheless a key element of the conspiracy because only she had access to Experian to fabricate the straw buyers' credit reports. Agent Ronnyne Bannister testified extensively at trial regarding the evidence located in Johnson's offices that demonstrated Johnson received $500 to $1,000 in payments prior to reporting fictitious tradelines. Contrary to Johnson's argument, the fact that she was paid in advance of the real estate closing does not diminish her role.

A reasonable jury could infer that Johnson understood why the fabricated credit histories she created were valuable to her co-conspirators. In particular, we are persuaded by the testimony of Tibakweitira that he told Johnson he sought her services to ensure that the people he was using to buy property had sufficient credit to get approved and, if they did not, he needed her to improve their credit histories. We are also persuaded by the testimony of Ligate that he met Johnson through Tibakweitira and that Johnson showed Ligate how the fraudulent enhancements worked. In addition, Agent Bannister testified that he interviewed Johnson in March 2011, and she admitted she

21

knew that Tibakweitira used her to create credit histories for real estate buyers who lacked credit histories, and she knew that mortgage fraud was being facilitated by her companies' use of stolen identities.

Johnson asserts that, at most, she was in a "buyer-seller relationship" with the realtors, not a co-conspirator. Appellant's Br. 36. This belies the facts as presented at trial. Johnson developed relationships with realtors by providing a service that was essential to the mortgage fraud conspiracy that she joined. *See Hackley*, 662 F.3d at 680 (finding that evidence of ongoing relationships and repeated transactions even where "sparse," is sufficient to support an inference of an ongoing conspirator relationship).

In sum, the evidence amply supports the conclusion that Johnson was an active and knowing participant in the conspiracy for which she was convicted. Having thoroughly reviewed the record, we conclude that Johnson has failed to make the requisite showing to challenge her conviction.[3]

V.

Finally, Johnson disputes whether the loss amount as adopted at sentencing was properly attributable to her. In reviewing the district court's loss calculation under the Sentencing Guidelines, "we review the district court's legal conclusions de novo and its factual findings for clear error." *United States v. Manigan*, 592 F.3d 621, 626 (4th Cir. 2010) (quoting *United States v. Layton*, 564 F.3d 330, 334 (4th Cir. 2009)). We will

---

[3] Johnson also makes passing, conclusory references to the lack of evidence that she actually prepared false loan applications, but of course she was tried for aiding and abetting on all of the substantive offenses.

22

"find clear error only if, 'on the entire evidence,' [we are] 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 631 (alteration in original) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).

In determining whether a loss is attributable, "a court must subtract the amount of money or benefits to which a defendant is legitimately entitled from the amount fraudulently claimed." *United States v. Miller*, 316 F.3d 495, 499 (4th Cir. 2003). The Government bears the burden of proving the loss amount. *United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir. 2000).

Members of a conspiracy can be held accountable at sentencing for the entire foreseeable loss caused by the conspiracy or scheme. "[T]he fraud loss properly attributable to a defendant[] must be determined on the basis of (1) the acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by a defendant; and (2) in the case of a jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *United States v. Bolden*, 325 F.3d 471, 498 (4th Cir. 2003) (citing U.S.S.G. § 1B1.3(a)(1)(A)-(B)). Generally, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1, cmt. n.3(A)(i). Reasonably foreseeable pecuniary harm is harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1, cmt. n.3(A)(iv). "In calculating the total loss attribution, a district court 'need

23

only make a reasonable estimate of the loss.'" *United States v. Jones*, 716 F.3d 851, 860 (4th Cir. 2013) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)).

Applying the above standards, we reject Johnson's argument that she should not be held accountable for all of the losses that banks suffered as the result of the Ligate and Tibakweitira schemes. The Government offered a total loss figure of $2,315,660.94 based upon actual losses suffered by the lenders after the properties fell into foreclosure. The lending banks relied upon the fabricated tradelines and the fabricated history of on time payments in deciding to extend mortgage loans. Johnson knowingly assumed the risk that the buyers whose credit histories she fabricated would not be able to pay their mortgage loans and the homes would go into foreclosure. Therefore, the losses that lenders suffered as a result were foreseeable to Johnson, and the court did not err when it found the loss attributable to her.

Johnson proposes to calculate the loss attributable to her based upon the gain on the particular transactions. This would be improper under the Sentencing Guidelines, which provide that the court "shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, cmt. n.3(B). Because the record provides ample support for the district court's finding that the loss amount was attributable to Johnson, we conclude that Johnson's argument is meritless.

VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

24